**Marcelle MYERS, C.I.T. Corporation, Plaintiffs-Appellees,**

v.

**The FIDELITY & CASUALTY COMPANY OF NEW YORK, Defendant-Appellant.**

No. 83–8898.

United States Court of Appeals, Eleventh Circuit.

May 10, 1985.

---

Lamar C. Walter, Savannah, Ga., for defendant-appellant.

George L. Hudspeth, Jacksonville, Fla., for C.I.T.

Before RONEY and CLARK, Circuit Judges, and SIMPSON, Senior Circuit Judge.

CLARK, Circuit Judge:

This appeal, which is brought by the Fidelity & Casualty Company of New York (Fidelity), arises from the grant of C.I.T. Corporation's (CIT) motion for summary judgment on a counterclaim asserted by Fidelity. Fidelity had sought restitution of $205,000.00 it had previously paid CIT as the result of the loss at sea of a vessel insured by Fidelity on which CIT held a mortgage.

In 1980, Marcelle Myers negotiated the purchase of a shrimp boat called the "Miss Vicki" from Nat Wilson assuming payment of a first preferred ship mortgage and a negotiable promissory note from Wilson to CIT. Article I of the first preferred ship mortgage contained the following covenant:

> Owner shall at its own expense, keep the vessel fully and adequately insured under usual full marine insurance.... All insurance shall be taken out in the name of Owner and shall by its terms be payable to Mortgagee for account of Mortgagee and Owner as their respective interests may appear, and all policy forms, ... shall be subject to Mortgagee's approval.... Owner shall maintain all such insurance unimpaired by any act, breach of warranty or otherwise....

*Record*, Vol. II at 212. On September 2, 1980 in a transfer agreement, CIT consent-ed to the sale of the "Miss Vicki" to Myers upon "the express agreement that said Transferor remain liable on the Contract and any note ... and that said Transferee assume said obligations...." *Record*, Vol. II at 219. The sale from Wilson to Myers was then consummated.

Until June 22, 1981 the shrimp boat was insured with the Stonewall Insurance Company. Because the policy was due to lapse, Kevin Pacetti, CIT's senior credit analyst, called Myers. Myers directed Pacetti to the Flem Hall Insurance Agency, which Pacetti contacted on June 4, 1981. On June 18, 1981 Pacetti received a letter from the agency which advised that the policy would be renewed.[1]

Myers telephoned Pacetti on June 22, 1981.[2] The following note, written by Pacetti to the file, reflects their conversation:

> Mr. Myers called this morning. Said he had intended to be able to send us $5,000.00, but the boat apparently ran aground, and the seam near the keel was leaking water, and he had to have it hauled out and repaired. Therefore, he said he would put a check in the mail today for $2,500.00. Hopefully, he will have something by the first of next week to send us. This will bring him current through January and a partial payment on February.
>
> I told him we needed to inspect the boat, therefore we needed a location. He said he didn't know if the boat would be coming back into Tampa or Apalachicola, but when it came in he would give us a call.

*Record*, Vol. II at 278. The former Stonewall policy, was not renewed but instead a new policy with Fidelity was issued. It became effective at noon on the same day that Pacetti received the telephone call from Myers regarding the condition of the

---

1. *See Record*, Vol. II at 269, 277. The letter provided:

   Re: Marcelle Myers
   "Miss Vicki"
   Expires 6/22/81

   Gentlemen:
   The above policy is being renewed. We will send a copy to you as soon as it is received in our office.

   Very truly yours,
   s/Flem J. Hall
   *Id.* at 277.

2. According to Pacetti, Myers called between the hours of 8:30 a.m. and 12:00 noon. *Record*, Vol. II at 269.

"Miss Vicki". CIT received the new policy at an undetermined date after June 22, 1981. Under the policy, Marcelle Myers was the named assured and CIT was the loss payee. As part of CIT's routine financing policies, Pacetti viewed the Miss Vicki on July 24, 1981 and found the vessel in good condition insofar as he could determine (*Record*, Vol. II at 270).

The "Miss Vicki" sank in August, 1981 and CIT suffered a total loss of security. Counsel for CIT requested payment from Fidelity to the extent of its financial interest in the vessel.[3] On August 28, 1981, Scott Bowers, who was a senior claims adjuster at Fidelity, sent a letter which provided in part:

> We are, at this point in time, carrying out a full investigation into the sinking of F/V "MISS VICKI". After the completion of this investigation, our position as to payment will be forwarded.

*Record*, Vol. II at 202.

On February 9, 1982, Scott Bowers sent the following letter:

> Enclosed please find our settlement check in regard to the above. This check represents full and final payment for any claims under the Breach of Warranty coverage.
>
> You will note that our liability is limited to the financial interest of C.I.T. at the time of the loss, however, not in excess of $205,000.00, thus, our check for that amount (see the attached copy of endorsement No. 3).
>
> We have closed our file in thie [sic] regard.

*Record*, Vol. II at 199.

Upon receiving payment from Fidelity, CIT sued Nat Wilson and Myers and secured a deficiency judgment against both for the balance of the note after the application of the $205,000.00 insurance payment. Myers paid CIT and the judgment was satisfied. Fidelity had knowledge of this suit and subsequent judgment.

After CIT obtained its judgment, Myers sued Fidelity for the difference between the face amount of the policy and the amount paid to CIT. During the first trial, which ended in a mistrial, Fidelity moved to join CIT claiming that "C.I.T. breached its duty to disclose the damaged keel (unseaworthiness of the vessel), a fact material to the risks, thus voiding the policy." Fidelity sought to recover the $205,000.00 previously paid to CIT. *Myers v. The Fidelity & Casualty Company of New York*, No. 282–109, slip op. at 3 (Dec. 6, 1983) [hereinafter cited as Dist.Ct.Op.]. The second trial, which started ten days after the first, ended in a verdict for Fidelity and against Myers. The jury did not render a verdict on Fidelity's counter-claim against Myers. The counter-claim against CIT was not at issue and was not submitted to the jury.

In granting CIT's motion for summary judgment, the court was persuaded by two factors. First, it found that "C.I.T. made no representation and was under no duty to report the keel to [Fidelity]." *Id.* at 4. Second, it found that CIT relied on Fidelity's payment when it satisfied its judgment in full against Myers. Because there were no genuine disputed issues of fact, the court found CIT was entitled to judgment as a matter of law.[4]

Fidelity contends that the district court erred in granting summary judgment because: (1) as a matter of law, CIT had a duty to report the grounding and keel damage prior to the inception of the policy; and (2) CIT failed to carry its burden of demonstrating the five elements necessary for the application of the doctrine of estoppel. CIT urges this court to affirm the district

---

3. *Record*, Vol. II at 200–201.

4. We note that "[s]ummary judgment should be entered only if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.*, 669 F.2d 1026, 1030 (5th Cir. Unit B 1982). In addition, summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Id.* at 1031 (citations omitted).

court's ruling because it did not have a duty to disclose the problems with the "Miss Vicki".[5] CIT also claims that the defense of estoppel was established because it relied on Fidelity's payment and letter when it sued Myers and obtained the deficiency judgment.

The issues before us in this appeal are twofold. First, we must decide what duty a mortgagee/loss payee has under a maritime hull insurance policy to inform an insurance company when it is given notice about a problem concerning the vessel. The second issue before us is whether the district court erred in granting summary judgment based on CIT's reliance on Fidelity's payment of the insurance proceeds.

Fidelity takes the position that CIT assumed the same contractual obligations as Myers and that it was required to comply with all terms, conditions and warranties in the policy.[6] Fidelity's argument is summarized in the following law review article

that considers the mortgagee's position in a hull policy:

> The underwriter's obligation to a known mortgagee of a vessel insured under a hull policy is similar to that of the owner, or the named assured. The obligation is created by naming the mortgagee an additional assured and/or including the mortgagee in the loss payable provisions of the hull policy.
>
> *Upon being named as additional assured, the mortgagee assumes the same contractual obligations as that of the assured in that he too is responsible for premium payments and must comply with all terms, conditions, and warranties contained in the insuring agreement.*

H. Mack, *The Hull Policy: Additional Assured; Loss Payees; Waiver of Subrogation; The Mortgagee's Position; Premiums; Deductibles and Franchises*, 41 Tul. L.Rev. 381, 385 (1967) (emphasis added) (footnotes omitted).[7]

---

**5.** CIT also contends that the only evidence upon which Fidelity relies to establish a duty on the part of CIT is the note to the file written by Pacetti. CIT cites the following colloquy before the court:

> THE COURT: The state of the evidence, insofar as your knowledge is concerned, is the telephone call. That is the only evidence there is?
>
> MR. WALTER: No, Your Honor. I believe there's other evidence. I asked for the testimony of one of the witnesses at the trial, the witness who said that he was told that it sank sometime in the early part of June after running aground. That was—
>
> THE COURT: Well, there was not any knowledge as far as CIT was concerned.
>
> MR. HUDSPETH: Well, no, Your Honor.
>
> MR. WALTER: The only knowledge he had was what was stated in that telephone call.
>
> THE COURT: Yes, that is all that matters here from the standpoint of their liability. All right, thank you very much.

*Record,* Vol. III at 23–24.

**6.** The policy had two pertinent provisions. The first, which discussed concealments or misrepresentations, provided:

> The entire Policy shall be void from inception ... if the Assured or his agent has concealed or misrepresented in writing or otherwise, any material facts or circumstances concerning this insurance or the subject thereof, or if the Assured or his agent has been guilty of a fraudulent action or attempted fraud or has

sworn falsely in reference to any matter or subject relating to this insurance, whether before or after a loss.

*Record,* Vol. II at 193. The second provision was a warranty of seaworthiness and provided:

> Warranted by the Assured that the Vessel named herein shall be in a seaworthy condition at the time of attachment of this insurance and shall be maintained in a seaworthy condition at all times. If the Vessel shall become unseaworthy as a result of a disaster the Assured shall restore it to a seaworthy condition promptly.

*Record,* Vol. II at 195. The policy also contained the following endorsement:

> BREACH OF WARRANTY
>
> In consideration of an additional premium of $513.00, it is understood and agreed that the Breach of any Warranty under this Policy shall not prejudice the right of the C.I.T., 1821 EXECUTIVE CENTER, DR., JACKSONVILLE, FLA. 32207 to collect in full to the extent of their financial interest in the vessel(s) named herein, in the event of loss, otherwise covered by the Policy. Payment, if any, under this clause being limited to the financial interest of the C.I.T. at the time of the loss, however, not in the excess of $205,000.00.

*Record,* Vol. II at 198.

**7.** No cases or other authority is cited to support the legal conclusion advanced. The article defines an "additional assured" as anyone who has an insurable interest in the property arising from ownership, charter or mortgage.

Fidelity claims the endorsement that eliminated the warranties under the policy did not eliminate the policy's conditions. Thus, when CIT allegedly concealed the fact regarding the condition of the ship, it breached a condition of the policy which caused the policy to be void from inception.

While we hold that there are facts and circumstances which would create a duty upon a mortgagee to inform an insurance company of facts known to it which are adverse to the risk insured against in the policy, we conclude that under the facts of this case Fidelity is not entitled to recover from CIT for a breach of a condition in the policy. Further, we hold that this is not a case involving estoppel, but involves the law of restitution and that under the facts Fidelity is not entitled to recover from CIT for its mistaken payment to CIT.

CIT did not "conceal or misrepresent in writing or otherwise any material facts or circumstances" from Fidelity. On June 18th it had received a letter from Fidelity's agent that a policy on the "Miss Vicki" would be renewed as of June 22nd. The telephone call from Myers that morning before the noon inception of the new policy that the vessel had apparently "run aground" and was taking water did not require that Pacetti call Fidelity's agent and relay the information. Myers' call indicated the boat would be coming into Tampa or Apalachicola. First, Pacetti could not make a judgment based on the scant information that the "Miss Vicki" was in an unseaworthy condition. His view of the vessel in Key West on July 22nd did not cause him any alarm. There is nothing to suggest that Pacetti was guilty of any fraud. Concealment and misrepresentations are badges of fraud. There is no real reason to believe that it crossed Pacetti's mind to call the agent and relay Myers' message. The insurance agent was agent for Myers as well as for Fidelity. The assertion by Fidelity that Pacetti had a duty to call the agent under the facts of this case approaches being frivolous.

We do not hold that a mortgagee *never* has a duty to inform an insurance company of known facts that would increase the company's risk of loss. While not the case here, if the mortgagee is the applicant for the policy, it would have a higher duty than where the owner of the property seeks the insurance. If a property owner seeks insurance on a vessel about to depart in an unseaworthy condition and the mortgagee knows of the owner's deception, it is very conceivable that the mortgagee could be denied recovery under the policy. Such a scenario might establish that a scheme had been devised whereby the insurance company would become the source of payment of the debt secured by the vessel. Here, there is not an indication of any intentional wrongdoing on the part of Pacetti. Fidelity failed to submit any evidence which would create a genuine issue of fact as to whether CIT had concealed from Fidelity information material to the risk.

We agree with the parties that there is a dearth of law on the subject of the responsibility of a mortgagee to an insurer under the facts similar to those here. In view of our conclusion that the facts would not sustain CIT's case being submitted to a jury, we find it unnecessary to discuss the law.[8]

We turn to the estoppel issue. The district court stated "it is apparent that C.I.T. *relied* on the genuineness of F & C's $205,000 payment by satisfying Myers' obligation on the note in full by the satisfaction of the deficiency judgment in the Middle District of Florida...." *Dist. Ct.Op.* at 347 (emphasis added). Fidelity claims the district court did not address the essential elements of equitable estoppel. We do not construe the case as turning on

---

**8.** Cases cited by the parties include: *Georgia Farm Bureau Mutual Insurance Company v. First Federal Savings & Loan Association of Statesboro,* 152 Ga.App. 16, 262 S.E.2d 147, 149–50 (1979); *Citizens State of Dickenson, Tex. v. American Fire and Cas. Co.,* 198 F.2d 57, 59 (5th Cir.1952); *Lumberman's Mutual Insurance Company v. Edwards,* 293 F.Supp. 687 (E.D.Mo. 1968); *Fidelity Phenix Fire Ins. Co. v. Garrison,* 39 Ariz. 277, 6 P.2d 47, 48 (1931); *Union Trust Company of Ellsworth v. Philadelphia Fire and*

the principles of equitable estoppel.[9] Fidelity had paid CIT $205,000.00 and sought to recover that sum in an action for money had and received under principles of restitution.

■ Williston has stated the general rule that bars the recovery of money paid under a mistake:

> If one to whom money has been paid under a mistake has so changed his position in reasonable reliance on his right to the payment as to be unable to restore it without a detriment greater than he would have incurred had the payment never been made, recovery is not allowed.
>
> . . . .
>
> A common illustration of change of position barring relief is where payment has been made to an agent who before discovery of the mistake has made settlement with his principal.

13 S. Williston & W. Jaeger, *A Treatise on the Law of Contracts* § 1595 at 584 and 586 (1970). The authors do point out that there are cases permitting recovery where the plaintiff's mistaken payment was caused by the defendant's fault. Having found insufficient fault on the part of CIT, we apply the basic principle stated in Williston's treatise.

■ Fidelity has essentially argued that it paid CIT the funds by mistake. However, Fidelity's payment after notifying CIT that it was conducting a full investigation and that it had closed its files on the matter, caused CIT to reasonably rely on its right to payment. In view of the payment from Fidelity, CIT secured its deficiency judgment for the balance of the note

after the application of the insurance payment. Fidelity has not convinced us that CIT will be put in status quo if the relief requested by Fidelity is granted.[10] Thus, we hold that the district court did not err in granting summary judgment in favor of CIT due to CIT's reliance on Fidelity's payment.

■ Even if we could not uphold the district court's decision on quasi contractual grounds, we would uphold it based on the following rule stated by Appleman:

> An insurer, by paying a claim without examination, cannot, in the absence of fraud, afterwards avail itself of a breach of warranty or assert a payment by mistake for want of knowledge of such breach. *The opportunity for full investigation and neglect to do so is as effective as knowledge to bind the insurer.*

16 C J. Appleman & J. Appleman, *Insurance Law and Practice* § 9366 at 567 (1981). Appleman cites *Harding v. Industrial Commission of Utah*, 28 P.2d 182 (Utah 1934) as one of the cases supporting this principle. In *Harding* the court stated:

> It would be unjust to both the employee and the insurance carrier if the law were that when the insurance carrier once undertakes to provide medical or other care for an injured workman it has lost all rights to afterwards defend against what it believes to be an unjust or illegal claim. . . . *It, however, cannot by its conduct in paying compensation over a long period of time, and after either full investigation or opportunity and time for such inquiry, and after the claimant's position has changed and*

> neither knowledge nor a reasonable means or opportunity of obtaining knowledge of the facts and must have relied upon the other party's representations to his detriment.

*Id.* at 730; *see also Cobb County Rural Electric Membership Corporation v. Board of Lights and Water Works of Marietta,* 211 Ga. 535, 87 S.E.2d 80 (1955).

*Machine Insurance Company,* 127 Me. 528, 145 A. 243, 247 (1929).

9. The requirements necessary to establish the defense of the equitable estoppel were outlined in *Choat v. Rome Industries, Inc.,* 462 F.Supp. 728 (N.D.Ga.1978):

> The person against whom the estoppel is to apply must have actual or constructive knowledge of the facts and must have induced, through his words or conduct, another to rely upon the purported representation. The party seeking to assert estoppel must have had

10. *See* 3 A. Corbin, *Corbin on Contracts,* § 606 at 649–50 (1960) (Relief is generally denied unless the other party is put in status quo.).

*rights to which he was entitled are lost by lapse of time and the running of the statutes of limitation, then interpose the defense that the policy of insurance did not cover the employee.*

*Id.* at 184.

In addition, the equities of this case do not favor Fidelity. The Georgia rule provides that "[i]gnorance of a fact due to negligence shall be equivalent to knowledge in fixing the rights of the parties." Ga.Code Ann. § 23–1–17 (1982). Moreover, "[i]f a party, by reasonable diligence, could have had knowledge of the truth, equity shall not grant relief; nor shall the ignorance of a fact known to the opposite party justify an interference if there has been no misplaced confidence, misrepresentation, or other fraudulent act." Ga.Code Ann. § 23–9–29 (1982). "Equity requires diligence, and will not do for one that which he could have done for himself but for his own negligence." *Glens Falls Indemnity Co. v. Liberty Mut. Ins. Co.*, 202 Ga. 752, 44 S.E.2d 543, 547 (1947).

Fidelity notified CIT that it was conducting a full investigation on August 28, 1981. On February 9, 1982, Fidelity paid and informed CIT that it had closed its files on the matter. It is clear that Fidelity had the *opportunity* to conduct a full investigation in which CIT fully cooperated. CIT has also lost the right to secure additional funds from Myers. Under these circumstances, we cannot hold that Fidelity has a right to recover the funds paid to CIT. Accordingly, we affirm.

AFFIRMED.