## In the MATTER OF HISTORIC MACON STATION LIMITED PARTNERSHIP, Debtor.

**HISTORIC MACON STATION LIMITED PARTNERSHIP, Debtor in Possession, Movant–Plaintiff,**

**v.**

**PIEDMONT–FORREST CORPORATION, Defendant–Respondent,**

**and**

**Georgia Power Company, United Way Macon and Bibb County, and Macon–Bibb County Convention and Visitors Bureau, Inc., Respondents.**

Bankruptcy No. 90–52051.
Adv. No. 90–5109.

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

March 24, 1993.

See also 126 B.R. 816.

Michael Weinstock, John M. Bruce, Atlanta, GA, for Historic Macon Station Ltd. Partnership.

Thomas C. James, III, Macon, GA, for Georgia Power Co. and Piedmont–Forrest Corp.

ROBERT F. HERSHNER, Jr., Chief Judge.

### STATEMENT OF THE CASE

Piedmont–Forrest Corporation filed a complaint on September 11, 1990. Piedmont–Forrest amended its complaint on September 24, 1990. Historic Macon Station Limited Partnership, Debtor, filed its response to the amended complaint on October 11, 1990. Old Historic Macon Station Corporation also filed its response to the amended complaint on October 11, 1990.

On the same day that Piedmont–Forrest filed its complaint with the Court, Debtor filed a complaint entitled "Complaint Seeking Declaratory Judgment Regarding Continuation of Leases; Motion to Assume Executory Leases." The complaint was against Georgia Power Company and Piedmont–Forrest.[1] Georgia Power and Piedmont–Forrest filed their responses to Debtor's complaint on October 11, 1990.

The Court consolidated the two adversary proceedings by order dated April 23, 1991.

Debtor filed a counterclaim against Georgia Power and Piedmont–Forrest on October 28, 1991. Georgia Power and Piedmont–Forrest filed their responses to the counterclaim on November 5, 1991.

A trial was held during the week of May 11, 1992. The Court, having considered the evidence presented, the arguments of counsel, and the briefs of counsel, now publishes this memorandum opinion.

### FINDINGS OF FACT

Georgia Power is a supplier of electricity in the State of Georgia. It leased space for its Macon Division office in the Charter Medical building. Midway through the thirty-year lease term, the lessor offered to buy the remainder of the lease term.

Georgia Power purchased from the City of Macon (the "City") a building known as the Macon Terminal Station (the "station"). The station previously was a railroad terminal. The station and its covered platform occupy about three acres. Georgia Power also purchased three acres of land adjacent to the station. The total purchase price was $400,000 and the transaction date was July 29, 1982. Georgia Power planned to move its Macon Division office to the station. The station is listed on the National Register of Historical Places. Renovation plans must be approved by the United States Department of the Interior.

Georgia Power employed the architectural firm of Dunwoody Beeland & Henderson to prepare renovation plans. Georgia Power spent $4,000,000 renovating the exterior and part of the interior of the station. Georgia Power then decided another party should complete the renovation.

Tate Ogle is a real estate developer who specializes in downtown redevelopment partnerships. Mr. Ogle and Timothy Anderson met with representatives of Georgia Power in 1983. Mr. Ogle and Mr. Anderson considered forming a limited partnership to finish the renovation of the station.

In October of 1983, Georgia Power asked several developers to submit proposals for renovating the station. The information brochure set forth that Georgia Power would retain fee simple ownership of the station. Georgia Power would exercise

---

1. The complaint also named as respondents the Macon–Bibb County Convention and Visitors Bureau, Inc. and United Way Macon and Bibb County. These respondents did not participate in the trial.

certain controls over design and usage of the station and the adjacent land. All renovation work had to meet "The Secretary of Interior's Standards for Rehabilitation." Only two developers submitted proposals; namely, the Ogle/Anderson group and the Cranston/Ascronics group.

Georgia Power completed a review of both proposals on February 10, 1984. Georgia Power had a number of objectives, including:

(1) Completing the project within Georgia Power's budget and minimizing cost;

(2) Obtaining first-class office space for the Macon Division;

(3) Providing positive public relations in downtown Macon;

(4) Revitalizing downtown Macon;

(5) Allowing Georgia Power to share in the developer's profits; and

(6) Historic preservation of the station.

Georgia Power's review report noted the following features of the two proposals:

| Analysis Factor | Cranston/Ascronics | Ogle/Anderson |
| --- | --- | --- |
| Investment Tax Credit received by the developer and lost by Georgia Power | $900,000 | $900,000 |
| Ownership | Georgia Power | (1) Ogle/Anderson (2) Georgia Power |
| Responsibility for ad valorem tax | Georgia Power | Ogle/Anderson |
| Growth space for Macon Division office | Not available | Mezzanine expansion would be available |
| Market | Compete with specialty shops on Cherry Street | Compliment specialty shops on Cherry Street |

The review committee recommended that Georgia Power negotiate a contract with Ogle/Anderson. Ogle/Anderson was interested only if the proposed limited partnership could acquire ownership of the station so the limited partners could receive certain investment tax credits and depreciation credits. Georgia Power, however, was concerned that its public image would be damaged if it sold the station. During the negotiations, Ogle/Anderson was assisted by William Campbell of Investment Services Incorporated, a Boston real estate syndication firm. Ogle/Anderson was represented by a New York law firm. Georgia Power's counsel was John Griffin. After several months of negotiations, Georgia Power and Ogle/Anderson reached an agreement.

Mr. Ogle, Mr. Anderson, and Allan Koch formed a partnership known as Historic Macon Station Limited Partnership, the Debtor in this bankruptcy case. Thirty-three limited partnership interests were sold for $109,000 each. These contributions were payable in installments over six years. The initial structure of the limited partnership was as follows:

Historic Macon Station Limited Partnership (Debtor)

Limited Partners:
ISI Investment Associates X Limited Partnership
(Michael J. Dowd, General Partner)
33 limited partnership interests @ $109,000 each

General Partner
Urban Properties I, Ltd.

Limited Partners
S.F.B. Capital Corporation
B. Tate Ogle
Allan J. Koch
J. Timothy Anderson

General Partner
Urban Partners I, Ltd.

Limited and General Partners
B. Tate Ogle
Allan J. Koch
J. Timothy Anderson

---

The Investment Memorandum[2] sent to prospective limited partners stated, in part:

2. *Characterization of the Partnership and GPC as Joint Ventures*

....

Special Counsel believes there are several significant facts that indicate the Partnership and GPC should not be treated as joint venturers for federal income tax purposes. First, the parties do not intend to act as joint venturers with respect to the Property. The absence of such an intention will be demonstrated objectively. The Partnership and GPC will not hold themselves out to others as co-venturers; they will not share in managing the Property; they will not share in the net profits, if any, derived from the Property; and they will not file an annual federal income tax return as though they were joint venturers.

Second, the various relationships between the Partnership and GPC established under the Station Agreement, the GPC Sublease, the Development Agreement and the Land Agreement will be traditional vendor-vendee (see "Treatment of the Partnership as the Equitable Owner of the Station"), debtor-creditor, employer-independent contractor and lessor-lessee relationships. The mutual obligations arising out of each of these relationships are generally inconsistent with the concept of a joint venture....

....

Of the economic arrangements between the Partnership and GPC, the single factor which weights most strongly in favor of joint venture status is the method for determining the consideration to be paid by the Partnership in 30 years for the Land should the Partnership exercise its purchase option (or should GPC require it to do so) with respect to the Land. The option price is an amount equal to 42.5% of the Property's value in 30 years. The IRS might contend that, because the Property consists of both the Land and the Station, the latter of which the Partnership will already own at the time the Partnership acquires the Land, GPC will in effect be sharing in any post-acquisition appreciation (or suffering post-acquisition depreciation) in the value of the Station.

Special Counsel believes that the parties will not be considered joint ventures as a result of the relationship between the Land option price and the value of the Station. First, for a period of at least 30 years from the Closing Date, the Partnership will have the benefits and burdens of ownership with respect to the

2. The Investment Memorandum was dated June 1, 1984.

Station. (See "Treatment of the Partnership as the Equitable Owner of the Station".) Thus, for example, if the Station were destroyed or condemned during that period, the Partnership would be the party that would economically sustain the loss, if any, with respect to the Station. The mere fact that the Partnership could possibly recoup a portion of that loss by acquiring the Land at a price lower than it would have paid if the Station had instead appreciated is not sufficient to justify treating the Partnership and GPC as joint venturers. Furthermore, the Station will be more valuable to the Partnership once it exercises the option to acquire the Land. It is only after acquiring legal ownership of the Land that the Partnership will be assured of retaining its interest in the Station. This is because the Station would otherwise revert to GPC at the expiration of the Partnership's leasehold interest in the Land. Consequently, it is not unreasonable for GPC, prior to forfeiting its reversionary interest, to realize some of the appreciation inherent in the Station. Accordingly, it is the opinion of Special Counsel that the method of determining the Land option price will not cause the Partnership and GPC to be treated as joint venturers.

*Investment Memorandum* pp. 74–76.

The Investment Memorandum continued, stating:

4. *Treatment of the Partnership as the Equitable Owner of the Station:* For the Partnership to be entitled to claim investment tax credits and cost recovery deductions with respect to the Station, the Partnership must be able to establish that it is the equitable owner of the Station.

In order to determine the "equitable" ownership of property subject to a lease, both the intent of the parties and the economic realities of the transaction must be analyzed. *See Frank Lyon Co. v. United States,* 435 U.S. 561 [98 S.Ct. 1291, 55 L.Ed.2d 550] (1978). Where a purported lessee has an option to purchase leased property, or is given complete use of the property for substantially all of its useful life, the lease transaction may be characterized as a sale for federal income tax purposes. In that event, the equitable ownership of the property will be considered to have passed to the lessee at the time the lease was entered into. . . .

. . . Both the Partnership and GPC will treat the transaction as a sale for federal income tax purposes and will treat payments of "rent" under the Station Agreement as payments of the purchase price of the Station plus interest. Because (i) the parties intend the transaction to be a sale of the Station and will act consistently with that intention; (ii) the Partnership will have an option to purchase the Station for a nominal amount at the expiration of the lease term and may acquire title to the Station earlier by prepaying the remaining "rent"; (iii) the payments under the Station Agreement are computed on the basis of the purchase price of the Station with simple interest at the rate of 9%; and (iv) the benefits and burdens of ownership of the Station pass to the Partnership under the terms of the Station Agreement, Special Counsel believes that a court would more likely then [sic] not characterize the transaction between GPC and the Partnership as a sale for federal income tax purposes.

. . . Because GPC and the Partnership have agreed to treat the Station Lease as a nonrecourse note, and because Special Counsel has concluded that the transaction between the Partnership and GPC will be treated as a sale of the Station, the Partnership's indebtedness under the Station Agreement will hereafter be referred to as the "GPC Note". The purchase money component of GPC Note will be referred to as the "PM Note", and the Phase I construction component will be referred to as the "Phase I Note".

. . . .

The decided cases have left some uncertainty as to the proper standards to be applied in determining the equitable ownership of property subject to a sale and leaseback, since each decision has been based on all the facts and circumstances

of the particular transaction. Nevertheless, Special Counsel is of the opinion that the GPC Sublease should not preclude the partnership from being considered the equitable owner of the entire Station.

*Investment Memorandum* pp. 78–80.

A Letter of Intent dated March 15, 1984, was executed by William G. Jones, Jr., for Georgia Power, and by Michael J. Dowd for Macon Terminal Area Redevelopment Associates.[3] Mr. Jones was corporate facility manager for Georgia Power. Mr. Jones also was vice president of Piedmont–Forrest.[4] Mr. Dowd was president of Investment Services Incorporated. The letter contains an analysis entitled "Calculation of Present Value of Sale of Macon Terminal by Georgia Power Company." The analysis shows that Georgia Power would receive rent concessions during the first seven lease years worth $584,040.[5] It further shows that Georgia Power would receive "Note Payments" worth $3,464,251 over a term of thirty years. Georgia Power would receive part of the net operating income from other tenants that lease space in the station. The analysis shows "Georgia Power will have a 42.5% interest in the net proceeds of a sale of the property which net amount is expected to be $30,-000,000 in year 2013."

Representatives of Georgia Power and Debtor executed a number of documents dated June 28, 1984, memorializing their agreement. Some of the documents are described below. The two key documents in the Court's analysis are the Building Lease and the Land Lease. The Building Lease, the Land Lease, the Development Agreement, the Sublease, and the Option Agreement provide that the laws of the State of Georgia will govern.

*The Building Lease*

Georgia Power leased the station to Debtor under the terms of a Building Lease. The lease term is thirty years.

Base rent is paid in arrears on the last day of each month. Debtor has the option to purchase the station for $100 during the thirtieth year of the lease. Debtor cannot exercise the option if there exists a default that may be cured by payment of a sum of money. Default includes Debtor's failure to pay rent within ten days after notice from Georgia Power. If Debtor exercises its option to purchase the land under the Land Lease, then Debtor is required to exercise its option to purchase the station under the Building Lease. Title to the station would be conveyed to Debtor by limited warranty deed.

Debtor has a "prepayment option" to purchase after the fifteenth year of the Building Lease. The prepayment option price is the greater of the "unpaid principal balance and accrued interest hereunder pursuant to Section 3.1(a)" and the present value of the remaining base rent payments. Debtor cannot exercise the prepayment option if there exists a default that may be cured by the payment of a sum of money.

Section 3.1(a) of the Building Lease provides:

## ARTICLE III

### TAX TREATMENT

Section 3.1. *Tax Treatment.* (a) For purposes of the Code (but without diminishing the rights and remedies of Landlord under this Lease), Landlord and Tenant do hereby acknowledge that by virtue of this Lease and the transaction contemplated hereby Tenant will acquire rights equivalent to beneficial ownership of the Building, and they agree to report this Lease and the transaction contemplated hereby as a sale of the Building by Landlord to Tenant, for a consideration of Six Million One Hundred Ten Thousand One Hundred Sixty–Nine and No/100 Dollars ($6,110,169.00) payable Fifty Thousand and No/100 Dollars ($50,000.00) upon the execution hereof

---

**3.** The Court has referred to this entity simply as "Ogle/Anderson."

**4.** Piedmont–Forrest is a wholly owned subsidiary of Georgia Power. Piedmont–Forrest has a total of five employees.

**5.** All figures represent present value. Georgia Power was to sublease part of the station from Debtor and pay below market rent.

and the balance amortized over a term of thirty (30) years at simple interest of nine percent (9%) per annum. The payments of Base Rent shown on Exhibit B reflect such payments of principal and interest and each such payment shall be applied first to interest.

Because of this provision, Debtor's limited partners received a $900,000 investment tax credit for the $4,000,000 that Georgia Power spent on renovations. The limited partners received a $300,000 charitable tax deduction for the historic preservation facade easement.

### The Land Lease

Georgia Power and Debtor executed a Land Lease with a term of sixty-seven years. Base rent is paid in advance on the first day of each month. Base rent is $50,000 per year during the first thirty years. Thereafter, rent increases based upon a capitalization rate and the fair market value of the land. Debtor also must pay "percentage rent" if part of the station is leased to a tenant other than Georgia Power.[6] The percentage rent is eleven to fifteen percent of gross rent. Default under the Land Lease includes Debtor's failure to pay rent within ten days after notice from Georgia Power.

Debtor has the option to purchase the land during the thirtieth year of the lease. The purchase price is 42.5 percent of the then fair market value of the land and the station after first deducting certain outstanding loans. If Debtor exercises the option to purchase the station under the Building Lease, it is required to exercise the option to purchase the land under the Land Lease. Title to the land would be conveyed to Debtor by limited warranty deed. Georgia Power can require Debtor to purchase the land during the thirtieth year of the lease on the same terms described above. The Building Lease and Land Lease contain cross-default provisions.

Georgia Power can sever from the Land Lease all or a portion of land known as the "separate parcel."[7] The separate parcel is located on the northeast corner of the land. Georgia Power must construct "decked parking" to compensate for any loss in parking spaces. In the event of a "partial condemnation," the Building Lease and Land Lease provide that the leases continue and do not terminate. Condemnation proceeds would be paid in trust to Debtor with a duty to restore the property.

A number of other documents were executed by Debtor, Georgia Power, and Piedmont–Forrest. Some of these documents are described below.

### The Limited Warranty Deed

Georgia Power was the record titleholder of the station and the land. Georgia Power's interest was encumbered by a blanket indenture bond. Debtor was to acquire financing from a lender that required a first lien. Georgia Power conveyed the station and the land to Piedmont–Forrest, a wholly owed subsidiary of Georgia Power. The limited warranty deed from Georgia Power shows that transfer tax was paid on a sale of $4,550,400. Thus, record title to the station and the land was held by Piedmont–Forrest. Georgia Power assigned its interest in the Building Lease and Land Lease to Piedmont–Forrest. Debtor was to make rent payments to Piedmont–Forrest.

### The Sublease

Georgia Power subleased part of the station from Debtor. Thus, Piedmont–Forrest held title to the station, Debtor was a lessee, and Georgia Power was a sublessee. The station contains 86,000 square feet of usable space. Georgia Power was to occupy 43,000 square feet.[8] The sublease term is thirty years. Georgia Power has certain options to extend the sublease for thirty-seven additional years.

The base rent on the sublease for the first year was $212,900. The rent increas-

---

6. This "percentage rent" is paid under the Land Lease rather than under the Building Lease.

7. Attached to this memorandum opinion, as Exhibit A, is a sketch of the land showing the station, the separate parcel, and the "option parcel." This sketch may not be to scale.

8. Georgia Power's actual space may have been about 37,000 square feet. This difference does not affect the Court's decision.

es each year. Georgia Power pays "additional rent" based on operating expenses associated with its space. The sublease provides, in part:

Section 5.09. *Character of Tenants.* The space in the Building, other than the Building Space, shall be leased only to tenants who are of the following character: banks, restaurants, department stores, clothing and other specialty stores, hair salons and barber shops, high-class merchants and general office tenants; Landlord must receive the prior written consent of Tenant before leasing any other space in the Building to any tenant of a character other than as set forth above, which consent shall not be unreasonably withheld if the use of such space is consistent with the above-listed permitted uses. Landlord agrees that no other space in the Building shall be leased to occupants of the following character: markets, grocery stores, bars, saloons or cocktail lounges (unless the last three uses are related to a restaurant earning less than half of its income from the sale of alcoholic beverages), pawn shops, employment agencies, hiring halls, game rooms, arcades, bowling alleys or tenants of like character.

*The Development Agreement*

The station was to be renovated in three phases. Georgia Power had started making Phase I improvements before Debtor became involved in the station. Georgia Power agreed to complete these improvements. Debtor would pay for the completion of these improvements and pay Georgia Power $100,000 for supervising the completion.

Phase II involved renovating the remainder of the station, except that portion of the interior set aside for subleasing to tenants other than Georgia Power. Debtor was required to spend a minimum of $1,550,000 on certain Phase II improvements referred to as "hard costs." Debtor was required to spend an additional $200,-

000 on "soft costs."[9] Phase II work was to be started by September 1, 1984, and completed by December 31, 1985. Georgia Power and the Department of the Interior were to approve the plans. Renovation work was to be supervised by the architectural firm of Dunwoody Beeland & Henderson and AMP Associates.

Phase III work required Debtor to improve the unfinished interior of the station to accommodate the needs of commercial and retail tenants.

To finance the renovation, Debtor borrowed $1,790,000 from Southern Floridabanc Savings Association (hereinafter "Southern Floridabanc"). The debt was secured by a lien on Debtor's interest in the station. S.F.B. Capital Corporation owned a one-half interest in Urban Properties I, Ltd., the general partner of Debtor. S.F.B. Capital Corporation was a wholly owned subsidiary of Southern Floridabanc.

Southern Floridabanc secured Debtor's obligations under the Development Agreement with an irrevocable letter of credit in the amount of $1,550,000 payable to Georgia Power. The Development Agreement did not contain a cross-default provision with the Building Lease or Land Lease. Upon Debtor's default under the Development Agreement, Georgia Power could either file suit for damages or call upon the letter of credit.

Georgia Power was required to notify Southern Floridabanc if Debtor defaulted on rent payments under the Building Lease or Land Lease. Southern Floridabanc had the right to cure a default.

*Option Agreement*

Georgia Power gave Urban Properties[10] an option to purchase the land known as the "separate parcel." Urban Properties had to exercise the option on or before June 30, 1991. The purchase price would be the parcel's fair market value at the time the option was exercised. The option could not be exercised if there was an uncured monetary default under the Build-

---

9. Soft costs included decorative eagles, developer's overhead, consulting fees, and loan fees and interest.

10. Urban Properties was the general partner of Debtor.

ing Lease or Land Lease. If either the Building Lease or Land Lease terminate, the option is void. The option could not be exercised if Georgia Power gave notice of its intent to sever the separate parcel under the Land Lease.

*Rent Payments*

Debtor paid rent on the station and the land to Piedmont–Forrest. Georgia Power occupied part of the station and paid rent to Debtor. The annual base rent for the first thirty years is shown below:

| Lease Year | Year [1] | Payments From Debtor to Piedmont–Forrest | | | | | Payment from Georgia Power to Debtor for Part of Building | = | Net Cash Flow to or from Debtor |
|---|---|---|---|---|---|---|---|---|---|
| | | Building Rent | + | Land Rent | = | Total Rent | (−) | | |
| 1 | 1984 | $ 311,900 | | $50,000 | | $ 361,900 | | $212,900 | < $149,000 > |
| 2 | 1985 | 329,251 | | 50,000 | | 379,251 | | 230,251 | < 149,000 > |
| 3 | 1986 | 348,017 | | 50,000 | | 398,017 | | 249,017 | < 149,000 > |
| 4 | 1987 | 368,312 | | 50,000 | | 418,312 | | 269,312 | < 149,000 > |
| 5 | 1988 | 400,261 | | 50,000 | | 450,261 | | 291,261 | < 159,000 > |
| 6 | 1989 | 356,998 | | 50,000 | | 406,998 | | 314,998 | < 92,000 > |
| 7 | 1990 | 372,671 | | 50,000 | | 422,671 | | 340,671 | < 82,000 > |
| 8 | 1991 | 350,435 | | 50,000 | | 400,435 | | 368,435 | < 32,000 > |
| 9 | 1992 | 285,463 | | 50,000 | | 335,463 | | 398,463 | 63,000 |
| 10 | 1993 | 317,938 | | 50,000 | | 367,938 | | 430,938 | 63,000 |
| 11 | 1994 | 353,059 | | 50,000 | | 403,059 | | 466,059 | 63,000 |
| 12 | 1995 | 411,043 | | 50,000 | | 461,043 | | 504,043 | 43,000 |
| 13 | 1996 | 452,122 | | 50,000 | | 502,122 | | 545,122 | 43,000 |
| 14 | 1997 | 538,563 | | 50,000 | | 588,563 | | 589,550 | 987 |
| 15 | 1998 | 587,598 | | 50,000 | | 637,598 | | 637,598 | 0 |
| 16 | 1999 | 639,562 | | 50,000 | | 689,562 | | 689,562 | 0 |
| 17 | 2000 | 695,762 | | 50,000 | | 745,762 | | 745,762 | 0 |
| 18 | 2001 | 756,541 | | 50,000 | | 806,541 | | 806,541 | 0 |
| 19 | 2002 | 822,274 | | 50,000 | | 872,274 | | 872,274 | 0 |
| 20 | 2003 | 893,365 | | 50,000 | | 947,365 | | 943,365 | < 4,000 > |
| 21 | 2004 | 893,365 | | 50,000 | | 947,365 | | 943,365 | < 4,000 > |
| 22 | 2005 | 893,365 | | 50,000 | | 947,365 | | 943,365 | < 4,000 > |
| 23 | 2006 | 983,042 | | 50,000 | | 1,033,042 | | 943,365 | < 89,677 > |
| 24 | 2007 | 1,001,726 | | 50,000 | | 1,051,726 | | 943,365 | < 108,361 > |
| 25 | 2008 | 1,001,726 | | 50,000 | | 1,051,726 | | 943,365 | < 108,361 > |
| 26 | 2009 | 1,522,365 | | 50,000 | | 1,572,365 | | 943,365 | < 629,000 > |
| 27 | 2010 | 1,472,365 | | 50,000 | | 1,522,365 | | 943,365 | < 579,000 > |
| 28 | 2011 | 1,543,362 | | 50,000 | | 1,593,362 | | 943,365 | < 649,997 > |
| 29 | 2012 | 1,543,362 | | 50,000 | | 1,593,362 | | 943,365 | < 649,997 > |
| 30 | 2013 | 1,543,362 | | 50,000 | | 1,593,362 | | 943,365 | < 649,997 > |

1. The lease term began in July of 1984. Annual rent increases were effective in or around July of subsequent years.

---

Beginning in 1992, the rent that Debtor was to receive from Georgia Power would exceed the rent that Debtor paid to Piedmont–Forrest. Debtor would then be in a positive cash flow position until the year 2003.

The Court recognizes that Georgia Power and Piedmont–Forrest are distinct corporate entities. They acted through the same individuals during the events relevant to this memorandum opinion. The testimony and other evidence presented sometimes referred to Georgia Power when the correct corporate entity was Piedmont–Forrest. For most purposes in this memoran-

dum opinion, it is not important to distinguish between the actions taken on behalf of Georgia Power and those taken on behalf of Piedmont–Forrest.

Georgia Power representatives sometimes referred to the transaction as a sale rather than as a lease. On July 16, 1984, C.O. ("Chuck") Rawlins sent W.Y. Jobe an Interoffice Correspondence.[11] That correspondence stated, in part, as follows:

> The development group, Historic Macon Station Limited Partnership, is purchasing the terminal on an installment basis and leasing back to Georgia Power the Macon Division's portion of the space.

11. Mr. Rawlins and Mr. Jobe were employees of Georgia Power.

The report attached to the correspondence stated:

*IV. Conclusion:*

In conclusion, [Georgia Power] is selling the terminal to [Ogle/Anderson] on an installment basis financing the sale for [Ogle/Anderson] at 9% simple interest (7.62% compounded interest).

Georgia Power moved its Macon Division office into the station in July of 1984. Georgia Power had intended to develop and lease the remainder of the station to upscale retail shops. Debtor initially continued with this concept. Debtor renovated part of the station but did not finish out the tenant space. There was an ongoing dispute concerning Debtor's obligations under the Development Agreement. It is clear that Debtor failed to honor some of its obligations under the Development Agreement. In the fall of 1985, Georgia Power sent Debtor a default letter under the Development Agreement. On September 27, 1985, Georgia Power and Debtor executed an amendment to the Development Agreement. Debtor agreed to complete a revised list of Phase II work without regard to cost.

Debtor employed James Snyder to supervise construction at the station. Mr. Snyder had an on-site office during the construction period and for about a year thereafter. Mr. Snyder left in 1986 or 1987. Debtor did not have an on-site employee thereafter. Georgia Power told Mr. Ogle that Debtor needed to have someone on site. Mr. Ogle testified that it did not make sense for Debtor to have an on-site employee in a single tenant building.

Debtor initially pursued the retail shop concept started by Georgia Power. Debtor wanted a major retail store as an anchor tenant. Mr. Ogle testified that several potential tenants from other areas of the country were approached. Debtor did not actively pursue local retail tenants.

Benjamin Bryant ("B.B.") Baisden was Georgia Power's manager of accounting and support services at the station. Mr. Baisden asked Mr. Ogle to drop the retail shop concept in January of 1986. Georgia Power did not want the station to compete with downtown shops. An application had been submitted to the Department of Housing and Urban Development to fund redevelopment of the Galleria, a downtown shopping center. The station would be in competition with the Galleria, and Georgia Power viewed this as undesirable.

Debtor then considered developing the station as office space. Debtor hired the McNeil Pike Leasing Company. McNeil Pike was able to successfully place one tenant, IDS Marketing Corporation. IDS executed a three-year lease, commencing January of 1986.[12] Mr. Ogle testified that every major office space user and bank in downtown Macon was contacted. There were two basic problems with the office space concept. Potential tenants were concerned about the prominent position of Georgia Power in the station. Georgia Power's offices occupied the second floor and would have looked down on first floor tenants. Second, renovation plans had to be approved by the Department of the Interior. The Department would not allow Debtor to lower ceilings or construct interior walls. It would have been difficult to provide lighting, heat, and air-conditioning in the large open areas.

Finally, Debtor began to focus on a hotel/conference center development. An undated report entitled "The Macon Project" stated that Urban Properties had received an Urban Development Action Grant (UDAG) grant for $654,497 to acquire the separate parcel and build a hotel. The City would provide a matching grant of $200,000. Mr. Snyder mailed Mr. Jones a letter dated June 10, 1986, stating that Debtor was proceeding with the development of a hotel/conference center. Georgia Power was enthusiastic about the hotel/conference center concept. Georgia Power planned to bring its employees from around the state to Macon for training. The employees would stay in the hotel and attend class in the station. This concept involved a third party constructing and operating the hotel. The hotel concept brought "po-

---

**12.** IDS did not renew its lease and moved from the station in 1988.

litical heat" from the downtown Hilton Hotel, which was located a few blocks from the station. The hotel concept, therefore, was dropped.

Georgia Power began considering how to deal with development problems at the station as early as March 24, 1987. Ken Olsoni, Jr., wrote an Interoffice Correspondence to Chuck Rawlins,[13] outlining five alternatives. The alternatives included Georgia Power buying Debtor's interest, Debtor buying Georgia Power's interest, and Georgia Power forcing or accepting a default by Debtor. Mr. Olsoni suggested that Georgia Power buy Debtor's interest.

Mr. Jones mailed Mr. Ogle a letter dated March 31, 1987, proposing that Georgia Power sublease from Debtor the remaining portion of the station for a term of twenty-seven years. In the alternative, Mr. Jones proposed that Georgia Power be given the option to purchase Debtor's leasehold rights during the last six months of 1989. Debtor did not accept these proposals.

In December of 1988, Glynnco Financial Services[14] prepared a proposal entitled "Conference Center at Macon Terminal Station." The conference center concept required the issuance of tax-free bonds, which the City would guarantee. The key to this concept was to obtain approval from Macon City Council. The conference center would be a condominium within the station. The City would lease or purchase the condominium space. The City would sublease space to conference center tenants. Debtor, Georgia Power, and representatives from the City and community worked closely on this concept. Potential tenants included Georgia College, the Macon Chamber of Commerce, and the Macon/Bibb County Convention and Visitors Bureau.

Macon Mayor Lee Robinson was in favor of the Chamber of Commerce moving to the station. The Chamber had its own building and was concerned that it would lose its autonomy if it moved to the station. The Chamber needed 10,000 to 15,000 square feet of space. The market rental

rate was $10.00 to $10.50 per annum in 1989. Debtor and Georgia Power worked together in trying to lease space to the Chamber. Macon City Council voted against participating in the conference center concept around August of 1989. Mr. Baisden continued to talk with the Chamber in the spring of 1990. It is not clear if he informed Debtor of the conversations that occurred in the spring of 1990.

The architectural firm of Culpepper, McQuliffe and Meadows prepared drawings for use in presentations to the Chamber. Mr. Baisden went to James F. Culpepper's office on or about April 15, 1990. Mr. Baisden borrowed some of the drawings. He did not have authority from Debtor to request the drawings. After Piedmont–Forrest purportedly terminated Debtor's interest in the station, Georgia Power used the drawings to make additional presentations to the Chamber. Ultimately, the Chamber did not move to the station.

James Hearnsberger was an employee of Mr. Campbell at Glynnco Financial Services. He became involved in the station when Old Historic Macon Station Corporation became the general partner of Debtor on January 1, 1988. Mr. Hearnsberger mailed a letter dated August 7, 1989, to Janice Marshall, executive director of the Macon/Bibb County Convention and Visitors Bureau. Mr. Hearnsberger proposed that Debtor lease to the Convention Bureau 3,994 square feet of space. The annual rent would be $10 per square foot. He asked Ms. Marshall to contact Mr. Baisden if she wanted to look at the space. Macon City Council voted against participating in the conference center concept around August of 1989. Debtor continued to pursue the Convention Bureau as a tenant. Mr. Hearnsberger mailed Ms. Marshall a letter dated November 1, 1989, expressing Debtor's continuing interest in leasing to the Convention Bureau.

Ms. Marshall mailed Mr. Hearnsberger a letter dated November 7, 1989, stating that the lease terms he proposed were accept-

---

**13.** Mr. Olsoni and Mr. Rawlins were employees of Georgia Power.

**14.** Glynnco Financial Services was a business owned by Mr. Campbell.

able. She stated that the Convention Bureau needed additional parking spaces, a rest room for staff, some remodeling, and an exterior sign. She stated that the Convention Bureau wanted to move as soon as possible. In December of 1989, Mr. Hearnsberger sent Emil Turk a draft copy of a proposed lease with the Convention Bureau. Mr. Turk, an employee of Georgia Power, had begun to assume Mr. Baisden's responsibilities at the station.[15]

In February of 1990, Mr. Ogle asked Ms. Marshall to have a contractor prepare a cost estimate for the remodeling she wanted. Debtor did not have funds to pay for the remodeling. The Convention Bureau was to pay for the remodeling and receive a reduction in rent. On April 10, 1990, Mr. Turk mailed a proposed lease with the Convention Bureau for Mr. Hearnsberger to sign. Mr. Hearnsberger signed and mailed the lease to Mr. Turk on April 16, 1990. The lease was never signed by the Convention Bureau. Piedmont–Forrest and the Convention Bureau executed a lease a short time after Debtor's interest in the station was purportedly terminated. That lease is almost identical[16] to the proposed lease signed by Mr. Hearnsberger.

Georgia Power took an active role in the operation and development of the station. Debtor did not have an on-site employee at the station during most of the relevant time. Mr. Baisden showed the station to prospective tenants and arranged for community groups to use the station. Mr. Baisden made the day-to-day decisions on managing, operating, and maintaining the station.

Representatives of Georgia Power usually participated in development plans for the station. Its representatives attended meetings and helped present proposals to business and community leaders.

Debtor's representatives testified that Georgia Power interfered with at least one tenant that was interested in moving to the station. Atlanta Gas Light Company wanted to lease 20,000 square feet. The annual rent would have been $12 per square foot. Atlanta Gas Light planned to have a sign prominently identifying itself with the station.

Atlanta Gas Light was a competitor of Georgia Power. Their marketing programs were in direct competition. Mr. Jones testified that it was not in the best interest of Georgia Power to have Atlanta Gas Light as a co-tenant. He acknowledged that Atlanta Gas Light would have been a respectable tenant and would have timely paid its rent.

Debtor did not need Georgia Power's approval to lease space to Atlanta Gas Light. Mr. Campbell testified, however, that Debtor did not want Georgia Power to be an unhappy tenant. Mr. Ogle testified that he did not pursue the Atlanta Gas Light lease because he was a team member who had to live with Georgia Power the rest of his life. Ultimately, Atlanta Gas Light did not move to the station.

Urban Properties and Georgia Power executed an option agreement dated June 28, 1984. Urban Properties could purchase, on or before June 30, 1991, the "separate parcel." Debtor planned to use this parcel for additional parking space. The option price was the fair market value of the parcel. Under the Land Lease, Georgia Power could "reacquire" the parcel. If Georgia Power decided to reacquire the parcel, it would be required to construct "decked parking" to replace the parking spaces lost. Urban Properties could not exercise its option to purchase after Georgia Power gave notice of its intent to reacquire or if there was an uncured default under the Building Lease or Land Lease.

The Georgia Legislature decided to develop a Georgia Music Hall of Fame. The State intended to construct and operate the Music Hall of Fame. The local government was to donate the land. The City wanted the Music Hall of Fame to be located in its downtown area. Georgia Power and Pied-

---

**15.** Mr. Baisden was transferred to Georgia Power's offices in Atlanta in March or April of 1990. The effective date of the transfer was August 12, 1990.

**16.** There are several minor differences in the leases that do not affect the Court's decision.

mont–Forrest supported this concept and were willing to sell part of the separate parcel at fair market value. The Court will refer to that part of the separate parcel as the "option parcel."

Representatives of Georgia Power had one or more meetings with community leaders. A handwritten note by Mr. Jones dated January 4, 1990, reflects a conversation between Mr. Jones and Mr. Baisden. The heading on the note is "Friendly Condemnation." The note shows that the City was interested in 2.2 acres which would affect 20 parking spaces. Meetings between Mr. Baisden, Buckner Melton, Gene Dunwoody, and Joan Harris were planned. Ms. Harris was attorney for the City. A "friendly condemnation" of the option parcel was planned. Georgia Power owed the City $140,000 and was considering exchanging the option parcel in satisfaction of that debt. The note shows that the City understood it could not negotiate with Georgia Power because Debtor had a "ground lease" and Urban Properties had an option on the separate parcel. The note shows that the Georgia Legislature needed to be advised by January 22, 1990, that the land could be acquired.

On September 21, 1990, Georgia Power and Piedmont–Forrest executed quitclaim deeds, conveying their interest in the option parcel to the City. Piedmont–Forrest has the option to repurchase the parcel if the City does not develop the property as a Music Hall of Fame. Georgia Power's appraiser valued the option parcel at $380,000. Georgia Power owed the City $140,000. The City "forgave" this debt. The evidence is not clear if Georgia Power or Piedmont–Forrest received any other compensation. There was concern that Debtor or Urban Properties had an interest in the option parcel. The City filed a condemnation proceeding on December 6, 1990.[17] Debtor, Urban Properties, Old Historic Macon Station Corporation, Mr. Ogle, Mr. Anderson, Mr. Koch, and Southern Floridabanc were named as defendants. Debtor appeared, through its counsel, and asserted that it owned both a leasehold interest and option rights in the option parcel. On December 21, 1990, the special master determined that Debtor was not entitled to any award or damages. The Superior Court of Bibb County, Georgia, accepted the award of the special master.

Urban Properties was the general partner of Debtor until the end of 1987. S.F.B. Capital Corporation owned a one-half interest in Urban Properties. Mr. Ogle was a limited partner of Debtor and Urban Properties. Mr. Ogle also was a general partner and a limited partner of Urban Partners, the general partner of Urban Properties. Southern Floridabanc, the parent corporation of S.F.B. Capital Corporation, became concerned that Mr. Ogle's involvement as both a general partner and a limited partner in Debtor's organizational structure was a conflict of interest. Urban Properties, therefore, resigned as general partner of Debtor effective January 1, 1988.[18]

James M. Saxon is an attorney and board certified tax specialist. Mr. Campbell hired Mr. Saxon to substitute Old Historic Macon Station Corporation as the general partner of Debtor. Old Historic Macon Station was a wholly owned subsidiary of ISI Investment Associates. Mr. Campbell was the president of Old Historic Macon Station. Old Historic Macon Station served as Debtor's sole general partner until Mr. Ogle became an additional general partner in October of 1990.

Georgia Power and Debtor expected to enjoy certain benefits from the transaction. Georgia Power would pay below market rent for its office space and maintain a favorable public image in the downtown area. It would receive eleven to fifteen percent of rent paid by other tenants in the station. It had some control over development. The remainder of the station would be developed without further capital spending by Georgia Power. If Debtor exercised its option to purchase under the Land

---

**17.** This Court entered an order granting the City relief from the automatic stay of the Bankruptcy Code to file the condemnation proceeding.

**18.** Mr. Ogle testified that he resigned as general partner of Debtor.

Lease, Georgia Power would receive 42.5 percent of the appreciated fair market value of the station and the land.

Debtor's limited partners would receive the investment tax credit arising from the $4,000,000 spent by Georgia Power. Georgia Power did not need this tax credit, but the limited partners could use it to reduce their income tax liabilities. The limited partners also would receive tax credits for depreciation and the historic facade easement.

Debtor was able to acquire only two tenants, other than Georgia Power, for the station. IDS Marketing Corporation leased a small area from 1986 to 1988. United Way entered into a lease in 1985.[19]

The relationship between Debtor and Georgia Power was frequently tense. Piedmont–Forrest sent letters of default under the Building Lease and Land Lease almost every month, beginning in July of 1989.

Macon City Council voted against participating in the conference center concept in August of 1989. Mr. Campbell mailed a letter dated August 11, 1989, to the limited partners. He explained that Debtor had run out of working capital and that certain operating expenses and lease payments had not been made. He noted that Debtor should file a bankruptcy case if it could not make lease payments of $37,000 prior to August 18, 1989.

On August 15, 1989, Mr. Campbell wrote the limited partners that Southern Floridabanc would probably foreclose on the station. He stated that he planned to meet with Southern Floridabanc to discuss possible solutions.

On October 23, 1989, Mr. Campbell wrote the limited partners that Debtor had hired Adams & Hemingway, a Macon law firm, to file a bankruptcy case if Southern Floridabanc proceeded to foreclose. He stated, however, that Southern Floridabanc had temporarily dropped the foreclosure action and had agreed to accept $950,000 as full settlement of Debtor's obligation of more than $2,400,000. He asked the limited partners to vote on three alternatives concerning a settlement with Southern Floridabanc and filing bankruptcy. He recommended that the limited partners contribute $100,000 in an attempt to consummate a settlement with Southern Floridabanc.[20] Mr. Campbell stated that a search committee had chosen part of the separate parcel as the site for the Georgia Music Hall of Fame. Mr. Campbell stated, "[W]e have suggested that the City initiate friendly condemnation procedures to determine the value of the property and to establish their control of the site. The Partnership's Land Lease with GPC [Georgia Power] did not anticipate a condemnation of the Partnership's vacant land, so it is difficult to determine the Partnership's proceeds, if any, from the proceeds of condemnation of the option property."

On January 9, 1990, Mr. Baisden told Mr. Jones that he had met with a representative of "South Fla Bank." This representative probably was an employee of the Resolution Trust Corporation (RTC). The RTC had taken over Southern Floridabanc and was managing its assets. This meeting was initiated by the RTC. Mr. Baisden understood that the "bank" would "take out" Debtor if requested by Georgia Power. Mr. Baisden inquired what Georgia Power wanted to do. Mr. Jones' handwritten notes say: "(1) Get partnership out, (2) Bank wants to keep property but [Mr. Baisden] thinks they really want to dispose of it (once partnership is out)." Mr. Baisden admitted that it would be inappropriate for him to talk with Southern Floridabanc or the RTC about "getting the partnership out."

Debtor defaulted on the rent payments under the Building Lease for December 1989 and the Land Lease for January of 1990. The RTC cured these defaults. Mr. Farless began managing the Southern Floridabanc assets for the RTC in or around January of 1990. Shortly after Mr. Farless

---

19. The term of the sublease with United Way has expired and United Way is a tenant at will.

20. Sometime later, the Resolution Trust Corporation (RTC) took over Southern Floridabanc and this settlement did not materialize.

came on board, he told Debtor that the RTC would not pay the rent due on January 31, 1990 for the Building Lease and on February 1, 1990, for the Land Lease. Mr. Ogle personally made these payments in February of 1990 to prevent termination of the leases.

On March 6, 1990, Mr. Campbell wrote Mr. Farless, expressing his frustration at trying to work with Southern Floridabanc and the RTC. The letter stated, in part:

> After two years, and several joint meetings with [Georgia Power], you have insisted for the right to negotiate directly with [Georgia Power]. Although we are not encouraged about opening up a negotiation without our involvement, we do not object to such negotiations if [the RTC continues to fund deficit payments and agrees to certain other conditions].[21]

Prior to Mr. Campbell's letter, Debtor's representatives had not given "permission" for Georgia Power and the RTC to negotiate without Debtor's involvement. The RTC, however, had contacted Mr. Baisden in January of 1990 about "taking Debtor out." Mr. Campbell was not aware of that contact.

Mr. Ogle told Mr. Jones on March 8, 1990, that he was going to put Debtor into bankruptcy the next day unless Mr. Jones agreed to meet with him. Mr. Jones agreed to meet with Mr. Ogle on March 16, 1990.

Mr. Griffin telephoned Mr. Saxon on March 14, 1990, and stated that Georgia Power or Piedmont–Forrest would pay up to $200,000 to satisfy materialmen's liens on the station and to obtain conveyances terminating all non-Georgia Power interests in the station. Mr. Saxon sent Mr. Griffin a counteroffer on March 16, 1990. The counteroffer would allow Georgia Power or Piedmont–Forrest an option to purchase Debtor's interest in the station no sooner than January 1, 1992. This date was chosen to give the limited partners time to plan for tax implications of the transaction. Under the counteroffer, Georgia Power or Piedmont–Forrest would pay

$300,000 to terminate Debtor's interest and to satisfy materialmen's liens. Georgia Power or Piedmont–Forrest would have complete operational control of the station during the option period.

On March 16, 1990, Mr. Ogle met with Mr. Jones at the Georgia Power building in Atlanta. Mr. Ogle asked Mr. Jones for a 120–day forbearance so he could try to buy out the RTC. The forbearance would prevent termination of the leases. If Mr. Jones did not grant the forbearance, Mr. Ogle planned to have Debtor file a Chapter 11 bankruptcy case. Mr. Jones did not give the forbearance.

Mr. Ogle went to Florida to talk with Mr. Farless on March 19, 1990. Mr. Ogle did not know that Mr. Campbell had given Mr. Farless permission on March 6, 1990, to negotiate directly with Georgia Power. Mr. Ogle was surprised that Georgia Power had been talking with the RTC about buying out either the RTC's or Debtor's position.

Representatives of Georgia Power, Debtor, and the RTC met at the Georgia Power building in Atlanta on March 22, 1990. Georgia Power was represented by Mr. Jones, Mr. Elder, Mr. Lovett, Mr. Baisden, Mr. Turk, Mr. Rawlins, Mr. Griffin, and Ms. Mary Grace Diehl. Debtor was represented by Mr. Saxon, Mr. Campbell, and Mr. Hearnsberger. The RTC was represented by Mr. Farless. Mr. Ogle, as a limited partner of Debtor, also attended the meeting. Debtor failed to make its rent payments under the Building Lease for February of 1990 and under the Land Lease for March of 1990. The Building Lease and Land Lease were scheduled to terminate on March 24, 1990. During the meeting, Mr. Griffin gave Debtor's representative a letter extending the termination date until March 26, 1990.

The purpose of the meeting was to discuss the restructuring of the station's ownership and debt. Georgia Power wanted control of the station. Debtor wanted to protect its limited partners from the conse-

---

21. The RTC did not accept these conditions.

quences of investment tax recapture.[22] The RTC wanted to have its lien bought out. Mr. Ogle wanted assurance that he would have time to have Debtor file a bankruptcy case if no agreement was reached. Ms. Diehl is an attorney who specializes in bankruptcy law. She and Mr. Griffin worked for the same law firm. Ms. Diehl suggested that Debtor file a pre-planned Chapter 11 bankruptcy case to facilitate a restructuring.

During the meeting, Mr. Ogle demanded, on several occasions, that he be given sufficient time to file a bankruptcy case for Debtor if an agreement could not be reached. Mr. Ogle and Mr. Hearnsberger understood that this assurance was given. Mr. Jones does not recall whether Mr. Ogle was given this assurance. Mr. Griffin denies that Mr. Ogle was given this assurance. It is clear that Mr. Ogle intended to have Debtor file a bankruptcy case to protect the limited partners if an agreement was not reached and that he communicated this to all participants at the meeting.

Georgia Power agreed to pay up to $350,000 in exchange for control of the station and acquisition of the RTC's lien position. Debtor owed the RTC about $2 million. The participants believed the RTC would want at least $200,000 for its lien position. The remainder of the $350,000 would be used to pay various debts through Debtor's preplanned Chapter 11 bankruptcy case. Mr. Saxon testified that Georgia Power would be responsible for negotiating and obtaining the lease with the Convention Bureau. Urban Properties was to release its option to purchase the separate parcel.

Piedmont–Forrest would forbear collection of rent from Debtor under the Building Lease and Land Lease until January 2, 1992. The RTC's lien that Georgia Power or Piedmont–Forrest would acquire would become due in January of 1992. Debtor would be obligated to purchase the station in January of 1992. It was anticipated that Debtor would be unable to perform its obligations and that Piedmont–Forrest would

foreclose. This foreclosure would cause the recapture of certain tax credits by the limited partners. The eighteen-month delay would give the limited partners time to plan for this additional tax.

At the end of the meeting, there were two major issues that needed to be resolved. First, Georgia Power had to analyze the tax implications of the agreement. Second, the RTC committee had to approve the agreement. Mr. Farless believed that he could get approval from the RTC committee within two weeks. Georgia Power agreed to give a thirty-day forbearance of the termination date of the leases if the RTC approved the agreement. This forbearance was to allow for the preparation of documents. Mr. Jones and Mr. Baisden testified that a "framework for an agreement" was reached.

Debtor was given a two-week extension of the termination date of the leases. Mr. Saxon, Mr. Hearnsberger, and Mr. Ogle, however, believed that an agreement had been reached and that Debtor need not be concerned with extensions of future termination dates. Mr. Campbell thought the purpose of continuing to have termination dates was to keep pressure on the RTC.

Mr. Jones' handwritten notes from a meeting with other Georgia Power employees on March 23, 1990, were introduced into evidence. The notes reflect that Georgia Power was concerned that the Internal Revenue Service would consider Georgia Power to be the owner of the station if Debtor filed a bankruptcy case. This would have certain adverse tax implications for Georgia Power.

Mr. Griffin mailed Debtor a letter dated March 28, 1990, memorializing the agreement to extend the termination date of the leases until April 9, 1990. On April 2, 1990, Mr. Griffin mailed two letters to Debtor, advising that the Building Lease rent due on March 31, 1990, and the Land Lease rent due on April 1, 1990, had not been paid.

---

**22.** Termination of the Building Lease and Land Lease would result in adverse tax consequences for the limited partners.

Mr. Hearnsberger mailed Mr. Farless a letter dated April 2, 1990. Mr. Farless had to leave the meeting on March 22, 1990, before it ended. The purpose of the letter was to outline the terms of the agreement. The letter stated that the agreement was subject to Georgia Power's resolution of certain tax issues. Mr. Hearnsberger noted that the next termination date was April 9, 1990. The letter stated that the following term was proposed by Georgia Power:

5) The execution of all required documents would be completed within 30 days of the approval of terms by SFB and the Partnership. GPC would forebear from enforcing a default under the leases during this timeframe.

Georgia Power continued to study the tax implications as the April 9, 1990, termination date was approaching. On April 6, 1990, Mr. Griffin mailed a letter to Debtor, stating that Piedmont–Forrest agreed to extend the termination date until April 16, 1990. Georgia Power resolved the tax issue sometime between April 9, 1990, and April 12, 1990.

Mr. Jones called Mr. Hearnsberger on April 12, 1990. Mr. Jones told him, "We've got a deal, we're going to go ahead with the transactions as agreed to. Mr. Griffin will be in contact with Mr. Saxton to draft the memorandum of understanding." Mr. Ogle testified that on April 12, 1990, "I got notified by James [Hearnsberger] that Bill [Jones] had called him up and said we had a done deal." Mr. Ogle testified that he is certain of the date because April 12, 1990, was his birthday. Mr. Jones admitted that he called Mr. Hearnsberger on April 12, 1990, but testified that he only advised Mr. Hearnsberger that Georgia Power was interested in going forward.[23] The Court, having considered the credibility of the witnesses and the weight of the evidence, is persuaded that Mr. Jones did convey to Mr. Hearnsberger that an agreement had been reached.

On April 16, 1990, Mr. Griffin mailed Debtor a letter that provided, in part:

This will confirm our verbal agreement with your counsel on April 13, 1990 that the effective date of the expiration and termination of the Building Lease and Land Lease has been extended until midnight on Monday, April 23, 1990 and that Southern Floridabanc Federal Savings and Loan Association (or its successors-in-interest) shall have until 5:00 p.m. Eastern Standard Time on Monday, April 23, 1990 to effect a cure of the defaults specified in the March 1, 1990 and April 2, 1990 notices.

This was the last written extension given to Debtor. It is undisputed that neither Debtor, the RTC, nor Mr. Ogle requested another extension. Mr. Saxon testified that it was not his job to stay on top of extensions. He testified that responsibility would have been Mr. Campbell's or Mr. Hearnsberger's. He testified that Mr. Griffin usually raised the issue of extensions.

Mr. Campbell testified that he told Mr. Hearnsberger to stay on top of the extensions. Mr. Campbell testified that Debtor had never asked Mr. Griffin to extend any prior termination date. He testified that Mr. Griffin initiated the extensions of the termination dates.

Mr. Griffin was careful, meticulous, and detail oriented. Debtor's representatives, on the other hand, were unsure whose responsibility it was to request extensions. The Court is persuaded that it was Mr. Griffin's usual course of dealing to write the letters extending the termination dates.

Mr. Griffin sent, by facsimile, a Memorandum of Understanding to Mr. Saxon on April 16, 1990. The purpose of the memorandum was to set forth, in general terms, the principal elements of the work-out agreement between Georgia Power, Piedmont–Forrest, Debtor, and the RTC. The memorandum provides that Debtor would file a preplanned Chapter 11 bankruptcy

---

**23.** Mr. Jones sent an Interoffice Correspondence dated June 6, 1990, to T.G. Boren, stating that Georgia Power had notified Debtor of its intent to pursue the proposed agreement on April 12, 1990. Mr. Boren was Mr. Jones' immediate supervisor. Mr. Boren was employed by Piedmont–Forrest, not by Georgia Power.

case. The RTC would transfer the Southern Floridabanc loan to Georgia Power. The memorandum provided, in part:

1. *Purpose....* It is not the intent of the parties either that this Memorandum shall contain all of the elements of the Transaction or that the parties be bound to the terms hereof unless and until the Transaction is consummated by the execution and delivery of all documents required by the parties.

. . . .

(3) c. This Memorandum shall not be binding on the parties hereto but shall provide the general framework of the Transaction, the details of all of which shall be subject to the approval of the parties and their counsel.

Mr. Saxon made a minor change in the memorandum and returned it to Mr. Griffin by facsimile on April 18, 1990. Mr. Griffin sent a draft of the memorandum to Mr. Farless and J.R. Burge of the RTC by facsimile on April 19, 1990. He asked that they obtain approval from the RTC committee. Mr. Saxon understood that Debtor would have a thirty-day forbearance to prepare and execute the required documents after the RTC approved the agreement. Mr. Ogle understood that Debtor had "forbearance as long as negotiations were bearing fruit." Mr. Hearnsberger believed that the agreement reached at the March 22, 1990, meeting superseded the default provisions. Mr. Campbell believed that the Memorandum of Understanding superseded the default provisions. Mr. Jones testified that the thirty-day forbearance was to begin following approval of the agreement by all parties. The RTC did not approve the agreement prior to the purported termination of the leases on April 23, 1990.

Neither Debtor, the RTC, nor Mr. Ogle requested, nor were they granted, another extension. Mr. Jones testified that Georgia Power, more than likely, would have given an extension if Debtor had requested an extension. Georgia Power and Piedmont–Forrest contend that the Building Lease and Land Lease terminated on April 23, 1990.

Mr. Saxon telephoned Mr. Griffin on April 30, 1990, and stated that it appeared the RTC had finally approved the agreement. Mr. Griffin told Mr. Saxon that the leases had terminated. Mr. Saxon testified that he was "shocked." He understood that an agreement had been reached at the March 22, 1990, meeting, subject to final documentation. Mr. Saxon believed that Debtor had an extension until the RTC made its decision. Mr. Griffin told him that the last forbearance letter had a specific termination date, that the leases were in default, and that Georgia Power was going to take possession of the station.

Mr. Saxon called Mr. Hearnsberger, who testified, "It was a total shock, because I felt we had an agreement, and that everybody had proceeded forward." Mr. Saxon asked Mr. Griffin to have Georgia Power reverse its position on May 2, 1990. Mr. Farless made a similar request on behalf of the RTC on May 7, 1990.

Mr. Campbell mailed a letter to Mr. Jones dated May 24, 1990, stating that Debtor was extremely dismayed by Georgia Power's actions. He asked that Georgia Power reverse its position that the leases had terminated. Mr. Farless had written a similar letter to Mr. Jones on May 22, 1990.

Mr. Griffin mailed a letter in May of 1990 to Mr. Farless, stating that no extension had been requested to the April 23, 1990, deadline and that Piedmont–Forrest would not agree to reinstate the leases. Mr. Griffin mailed a letter dated June 4, 1990, to Mr. Campbell, stating that the Memorandum of Understanding explicitly provided that it was not a binding agreement until consummated. Mr. Griffin noted that no extension had been requested to the April 23, 1990, deadline and that Piedmont–Forrest would not reconsider its position.

Mr. Jones talked with Mr. Griffin shortly after April 23, 1990. Mr. Jones' handwritten notes of this conversation show that he was advised to take the position that the leases had terminated because rent payments had not been received. Georgia Power, however, should continue to work

with Debtor as contemplated, but should change the locks on the station. Ms. Diehl believed that Georgia Power was in a "better starting position."

In October of 1990, the limited partners voted to admit Mr. Ogle as a co-general partner of Debtor. In April of 1992, Debtor's partnership certificate was amended to admit Mr. Ogle as a co-general partner. Thereafter, Mr. Ogle and Old Historic Macon Station Corporation have been the co-general partners of Debtor.

Mr. Jones testified that development of the station was not a partnership or joint venture between Georgia Power and Debtor. He admitted that Georgia Power was to share profits with the limited partners. Mr. Jones admitted the transaction was intended to be a sale of the station to Debtor and that Debtor's rent payments were payments on a promissory note. Mr. Jones admitted the transaction was like a balloon note.

Mr. Campbell testified that the transaction was a sale and lease-back. He understood that the station was purchased with a down payment and a promissory note with deferred terms. Mr. Campbell did not believe that Debtor was a joint venturer with Georgia Power or Piedmont–Forrest when the transaction was entered into in June of 1984. He believes that a partnership later developed "because of the way management of the project was done...." He testified, "And I believe during the period of time that we were working on the convention center, that both Georgia Power and the partnership held them out, themselves out to other people as co-venturers or partners involved in the joint undertaking." Mr. Campbell thought that Debtor and Georgia Power became joint venturers for economic purposes, but not for tax purposes.

Debtor did not file partnership tax returns with Piedmont–Forrest or Georgia Power. Piedmont–Forrest reported the rent it received from Debtor as income from an installment sale.

Frances A. Corwick is a certified public accountant. In 1986, the investor service agent of the limited partnership employed him to restructure the transaction between Georgia Power and Debtor. He testified that Georgia Power and Piedmont–Forrest booked the transaction as an installment sale with deferred profit. He understood that Debtor had an equity position in the station. He testified that a termination of the Building Lease and Land Lease on April 23, 1990, would cause a taxable gain similar to a forgiveness of debt. If the transaction was a true lease, the tax returns filed by the partnership would be incorrect and the limited partners would be liable for several million dollars of back taxes.

Mr. Corwick testified that Debtor's negative cash flow from March of 1990 until June of 1991 would have been about $130,000. He testified that the average tax consequence to each limited partner of terminating the leases would have been $60,000 to $65,000. Thus, it would have been in the best interest of the limited partners to contribute $130,000 to fund the deficiency until June of 1991. He testified that Mr. Ogle personally could have written a check for $130,000.

Craig Elder was Georgia Power's financial analysis manager from January of 1990 until April of 1990. He currently works in the financial services division. Mr. Elder testified that the transaction between Georgia Power and Debtor had many characteristics of a sale, but he considered it to be a "lease receivable" on Georgia Power's books. He admitted that Georgia Power basically financed the sale of the station and the land. He testified that Georgia Power treated Debtor's lease payments as a reduction in principal and payment of interest. Mr. Elder sent Mr. Jones an Interoffice Correspondence dated April 3, 1990. In the correspondence, Mr. Elder stated:

> GPC financed the sale of the land and building to Historic Macon Limited Partnership (HMLP) over 30 years for approximately $6.7 million at an effective interest rate of 7.62%
>
> GPC did not recognize a gain on the sale for accounting purposes. Instead the transaction was structured as a capital lease with an implicit interest rate of

10.94%. The financial asset was reflected on the Company's (actually Piedmont Forrest's) books at the original cost of $4.5 million.

Mr. Griffin, counsel for Georgia Power and Piedmont–Forrest, sent Debtor notices of default on the following dates:

| Default Letter | Lease in Default | Month in Default | Amount of Default |
| --- | --- | --- | --- |
| July 19, 1989 | Building | June 1989 | $33,355.08 |
| July 19, 1989 | Land | July 1989 | 4,166.67 |
| August 3, 1989 | Building | July 1989 | 29,749.83 |
| August 3, 1989 | Land | August 1989 | 4,166.67 |
| September 1, 1989 | Building | August 1989 | 29,749.83 |
| September 5, 1989 | Land | September 1989 | 4,166.67 |
| September 30, 1989 | Building | September 1989 | 29,749.83 |
| October 2, 1989 | Land | October 1989 | 4,166.67 |
| January 3, 1990 | Building | December 1989 | 29,749.83 |
| January 3, 1990 | Land | January 1990 | 4,166.67 |
| February 5, 1990 | Building | January 1990 | 29,749.83 |
| February 5, 1990 | Land | February 1990 | 4,166.67 |
| March 1, 1990 | Building | February 1990 | 29,749.83 |
| March 1, 1990 | Land | March 1990 | 4,166.67 |
| April 2, 1990 | Building | March 1990 | 29,749.83 |
| April 2, 1990 | Land | April 1990 | 4,166.67 |

Southern Floridabanc was sent copies of the default letters. Beginning in January of 1990, those copies were sent "in care of" the RTC. Southern Floridabanc and the RTC cured a number of defaults. In addition, Mr. Griffin sent letters dated October 10, 1989, and January 5, 1990, stating that Debtor had failed to pay property taxes on the land and station for 1989. Georgia Power sometimes paid its rent directly to Piedmont–Forrest when Debtor failed to make its payments to Piedmont–Forrest.

Debtor filed a petition under Chapter 11 of the Bankruptcy Code on July 23, 1990. Piedmont–Forrest or Georgia Power have managed the station since the purported termination of the Building Lease and Land Lease. They have been in possession of the station. Georgia Power pays its rent directly to Piedmont–Forrest. Piedmont–Forrest has collected rent from two tenants; namely, the Convention Bureau and United Way.

### CONCLUSIONS OF LAW

Georgia Power and Piedmont–Forrest contend that the Building Lease and Land

Lease were "true" leases, which were validly terminated prior to the filing of Debtor's Chapter 11 bankruptcy case. Georgia Power and Piedmont–Forrest contend that Debtor has no assumable interest in the leases. In the alternative, should the Court determine that Debtor can assume the leases, Georgia Power and Piedmont–Forrest ask the Court to determine that Piedmont–Forrest effectively exercised its right under the Land Lease to reacquire part of the separate parcel.

Debtor contends the leases were not "true" leases, but were "a sale of the Station to [Debtor] structured as a lease-financing, with Georgia Power retaining a financing interest secured by the title to the property." Debtor contends the transaction was a sale with secured financing or that it resulted in an implied trust. In the alternative, Debtor contends the leases were not terminated and can be assumed under section 365(a) of the Bankruptcy Code.[24]

Debtor also contends that it was a partner or joint venturer with Georgia Power

24. 11 U.S.C.A. § 365(a) (West 1993).

and Piedmont–Forrest. Debtor contends Georgia Power and Piedmont–Forrest breached a fiduciary duty by interfering with and acquiring business opportunities for themselves that belong to the partnership.

Debtor contends it is entitled to damages for Georgia Power's and Piedmont–Forrest's tortious and malicious interference with business relations. Debtor contends Georgia Power and Piedmont–Forrest committed fraud when they entered into the settlement agreement. Debtor contends it is entitled to punitive damages as a result of the actions of Georgia Power and Piedmont–Forrest. Debtor contends it should receive the proceeds from the condemnation of the option parcel by the City. Finally, Debtor contends the claims of Georgia Power and Piedmont–Forrest should be subordinated to the claims of other creditors.

■ The Court will first consider whether the transaction was a true lease or a sale. In *Martin Brothers Toolmakers, Inc. v. Industrial Development Board of the City of Huntsville (In re Martin Brothers Toolmakers, Inc.)*,[25] the Eleventh Circuit Court of Appeals stated:

> It is true that a real estate lease, as well as an installment sales contract, may be the functional equivalent of a secured financing transaction. The determination in bankruptcy, however, of whether a particular agreement is in fact a lease or a security agreement for purposes of § 365 often depends on which characterization will best serve the interests of the estate. Section 365 enables the bankruptcy trustee to affirm or reject leases and executory contracts, and is based on the trustee's long-standing power to abandon obligations burdensome to the estate.

796 F.2d at 1439.

■ "Whether a ... lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable State or

Local law." H.R.Rep. No. 595, 95th Cong., 1st Sess. 314 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6271.

■ The presence of an unexercised option to purchase in a real estate lease does not deprive the landlord of dispossessory proceedings otherwise available under Georgia law. *Hardy v. Ramey*, 128 Ga. App. 875, 198 S.E.2d 360 (1973). "An option to purchase land does not, before acceptance, vest in the holder of the option any interest, legal or equitable, in the land itself." *Reeve v. Hicks*, 197 Ga. 181, 28 S.E.2d 649, 651 (1944).

Debtor does not cite any Georgia case law or statutory authority to support its contention that the transaction was a sale.

In *Daniel v. Douglas County*,[26] Daniel argued that a contract was a lease with an option to purchase. The county contended the contract was a sale in installments. The contract provided that it "shall be construed as a lease with an option to purchase." The Georgia Supreme Court stated:

> 3. This evidence may be summarized as follows:
>
> Mr. Daniel desired to sell this property to the county so that the county could establish a park. They agreed on a price of $52,500. For tax purposes, Mr. Daniel insisted on spreading the payments over several years. The county believed it was constitutionally prohibited from buying the property on installments (apparently because of the provisions of 1983 Const. Art. IX, Sec. V, Para. I, limiting county debt). The county suggested that the sale could be accomplished by referring to it as a lease option, with the sales price divided into five declining payments (reflecting reduction of interest as the principle balance was reduced) with $10 to be paid for the execution of the deed. Such an agreement was executed on December 12, 1980. In 1981, the land was removed from the ad valorem tax rolls and shown as property of Douglas County. Daniel treated the

**25.** 796 F.2d 1435 (11th Cir.1986).

**26.** 261 Ga. 103, 401 S.E.2d 508 (1991).

transaction as an installment sale for tax purposes. The county paid the entire purchase price and made no further payments after December 14, 1984, and Daniel sought no further payments. The county has continued to occupy the land and has greatly improved it. In 1987 the county forwarded a warranty deed and $10 to Daniel. Daniel refused to sign the deed and demanded return of the premises.

401 S.E.2d at 509–10 n. 3.

The trial court had determined that the contract was an installment sale. The Georgia Supreme Court affirmed the trial court.

In *National Traveler, Inc. v. Paccom Leasing, Corp. (In re National Traveler, Inc.),*[27] the debtor contended that a lease for a trash compactor was a conditional sales contract rather than a true lease. This Court stated:

> Speedway contends that it considered the monthly payments to be rent. The fact that the contract is termed a "Lease Agreement Contract" and the parties are called lessee and lessor, however, is not binding on the Court. *Bill Swad Leasing Co. v. Stikes (In re Tillery),* 571 F.2d 1361, 1364–65 (5th Cir.1978); *Mejia v. Citizens & Southern Bank,* 175 Ga.App. 80, 81, 332 S.E.2d 170, 172 (1985); *Ford Motor Credit Co. v. Dowdy,* 159 Ga.App. 666, 667, 284 S.E.2d 679, 680 (1981), *overruled on other grounds,* 191 Ga.App. 121, 381 S.E.2d 94, 96 (1989), *cert. denied.*
>
> Georgia law does not require "magic words" to create a valid security interest. Rather, the court must refer to the general law of contracts and determine whether the parties intended to create a security agreement. *United States v. Hollie (In re Hollie),* 42 B.R. 111, 117 (Bankr.M.D.Ga.1984).
>
> The determining factor is the intention of the parties at the time the agreement was entered into as construed in light of facts and circumstances as they existed at that time. *Citizens & Southern*

*Equipment Leasing, Inc. v. Atlanta Federal Savings & Loan Assoc.,* 144 Ga. App. 800, 805, 243 S.E.2d 243, 247 (1978). A document is construed according to the intent of the parties as ascertained from factors that distinguish true leases from security agreements. *Leasing Service Corp. v. River City Construction, Inc.,* 743 F.2d 871, 878 (11th Cir.1984).

> The best test for determining the intent of an agreement which provides for an option to buy is a comparison of the option price with the market value of the equipment at the time the option is to be exercised. Such a comparison shows whether the lessee is paying actual value or acquiring the property at a substantially lower price. *Mejia v. Citizens & Southern Bank,* 175 Ga.App. at 82, 332 S.E.2d at 172; *Ford Motor Credit Co. v. Dowdy,* 159 Ga.App. at 667, 284 S.E.2d at 680.
>
> If the lessee has the option to become the owner of the property for no additional or for a nominal consideration, the lease is deemed to be intended for security. Any determination of whether consideration is nominal must be made on a case-by-case basis. *Mejia v. Citizens & Southern Bank,* 175 Ga.App. at 82, 332 S.E.2d at 172.

110 B.R. at 620–21.

*National Traveler* involved personal property rather than real property. The Court is persuaded, however, that it should look to the same principles in deciding the issue presented. Thus, the determining factor is the intention of the parties at the time the agreement was entered into as construed in light of facts and circumstances as they existed at that time.

The transaction between Debtor, Georgia Power, and Piedmont–Forrest was "sharply tailored by sophisticated parties," and structured as a sale-lease arrangement for tax and investment advantages. *See Liona Corp. v. PCH Assoc. (In re PCH Assoc.),* 804 F.2d 193, 194 (2d Cir.1986).

The Court is persuaded that the parties intended for the transaction to be a sale

---

**27.** 110 B.R. 619 (Bankr.M.D.Ga.1990).

with secured financing rather than a true lease. Debtor acquired rights equivalent to beneficial ownership in the station. The transaction was structured as a sale of the station to Debtor for a consideration of $6.1 million. Rent that Debtor paid on the station was tied to this sale price. Piedmont–Forrest treated the transaction as an installment sale with deferred profit. Debtor was obligated to make substantial improvements to the station. Debtor, or its limited partners, claimed a deduction for depreciation. The parties expected Debtor to become the record titleholder during the thirtieth year of the lease term. In fact, Piedmont–Forrest could require that Debtor purchase the station and the land. Georgia Power's representatives sometimes referred to the transaction as a sale. Mr. Elder, Georgia Power's financial analysis manager, admitted that Georgia Power basically financed the sale of the station and the land.

The Court has carefully considered the fact that Debtor must pay 42.5 percent of the fair market value of the station and the land. This purchase price is not nominal consideration. The transaction, however, was not a simple rent-to-own consumer lease. The transaction involved complex tax and investment strategies that produced financial benefits to Debtor's limited partners. Mr. Jones admitted that the transaction was intended to be a sale of the station to Debtor. He admitted that the transaction was like a balloon note. The Court is persuaded that the parties intended for the transaction to be a sale with secured financing. The Court, therefore, need not address the implied trust theory asserted by Debtor.[28]

■ Georgia Power and Piedmont–Forrest contend that Debtor's interest in the Building Lease and Land Lease was terminated prior to the filing of Debtor's bankruptcy case. Georgia Power and Piedmont–Forrest contend that the termination occurred regardless of whether the transaction was a sale or a true lease. Debtor contends Georgia Power and Piedmont–Forrest are estopped from asserting that its interest was validly terminated. In the alternative, Debtor contends Georgia Power and Piedmont–Forrest waived their rights to terminate its interest.

In *Morgan v. Thomas,*[29] the former Fifth Circuit Court of Appeals stated:

Waiver and estoppel are legal terms which are frequently used interchangeably. Although the legal consequences of each are often the same, the requisite elements are different. Waivers [sic] refers to the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor. *On the other hand, estoppel is any conduct, express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law. It is grounded not on subjective intent but rather on the objective impression created by the actor's conduct. It is in the area of implied waiver that the two doctrines are closely akin.*

448 F.2d at 1365 (quoting *Yoshida v. Liberty Mutual Ins. Co.,* 240 F.2d 824, 829–30 (9th Cir.1957)) (emphasis in original).

Section 24–4–27 of the Georgia Code[30] provides:

**24–4–27. Equitable estoppel.**

In order for an equitable estoppel to arise, there must generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his injury.

O.C.G.A. § 24–4–27 (1982).

In *Harris v. Abney,*[31] the Georgia Supreme Court stated:

"In order to constitute estoppel by conduct, there must concur—First, a false

---

**28.** *See* O.C.G.A. §§ 53–12–22 and –26 (1982) (repealed 1991). The new Georgia Trust Act took effect on July 1, 1991. 1991 Ga. Laws 810.

**29.** 448 F.2d 1356 (5th Cir.1971), *cert. denied,* 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972).

**30.** O.C.G.A. § 24–4–27 (1982).

**31.** 208 Ga. 518, 67 S.E.2d 724 (1951).

representation or concealment of facts; second, that it must be within the knowledge of the party making the one or concealing the other; third, the person affected thereby must be ignorant of the truth; fourth, the person seeking to influence the conduct of the other must act intentionally for that purpose; and, fifth, persons complaining shall have been induced to act by reason of such conduct of the other." *Tinsley v. Rice*, 105 Ga. 285, 290, 31 S.E. 174, 176.

67 S.E.2d at 725–26.

In *In re Myers, C.I.T. Corp. v. Fidelity & Casualty Co. of New York*,[32] the Eleventh Circuit Court of Appeals stated:

> The requirements necessary to establish the defense of the equitable estoppel were outlined in *Choat v. Rome Industries, Inc.*, 462 F.Supp. 728 (N.D.Ga. 1978):
>
> > The person against whom the estoppel is to apply must have actual or constructive knowledge of the facts and must have induced, through his words or conduct, another to rely upon the purported representation. The party seeking to assert estoppel must have had neither knowledge nor a reasonable means or opportunity of obtaining knowledge of the facts and must have relied upon the other party's representations to his detriment.
>
> *Id.* at 730; *see also Cobb County Rural Electric Membership Corporation v. Board of Lights and Water Works of Marietta*, 211 Ga. 535, 87 S.E.2d 80 (1955).

759 F.2d at 1548 n. 9.

■ "[T]here can be no estoppel by conduct where both parties have equal knowledge or equal means of obtaining the truth." *Cable Holdings of Battlefield, Inc. v. Lookout Cable Services, Inc.*, 178 Ga.App. 456, 343 S.E.2d 737, 740 (1986), *cert. denied.*

■ "In cases of silence there must be not only the *right* but the *duty* to speak before failure to do so can operate as an estoppel." *Tybrisa Co. v. Tybeeland, Inc.*, 220 Ga. 442, 139 S.E.2d 302, 305 (1964) (emphasis in original).

■ Estoppel is usually an issue of fact to be decided by the jury. *Eiberger v. West*, 247 Ga. 767, 281 S.E.2d 148, 150 (1981). "The burden rests upon the party asserting an estoppel to establish all the elements necessary to constitute an estoppel." *Bennett v. Davis*, 201 Ga. 58, 39 S.E.2d 3, 7 (1946). "Estoppels are not favored by our law." *Cobb Co. Rural Electric Membership Corp. v. Board of Lights and Water Works of Marietta*, 211 Ga. 535, 87 S.E.2d 80, 83 (1955).

■ Detrimental reliance is a necessary element of any claim of equitable estoppel. *City of Warner Robins v. Rushing*, 259 Ga. 348, 381 S.E.2d 38, 39 (1989).

■ "Under Georgia law, waiver is a matter of intent: the evidence must so clearly indicate an intent to relinquish a known right as to exclude any other reasonable explanation." *Allstate Financial Corp. v. Dundee Mills, Inc.*, 800 F.2d 1073, 1075 (11th Cir.1986).

In *Jordan v. Flynt*,[33] the Georgia Supreme Court stated:

> "Waiver is a voluntary relinquishment of some known right, benefit, or advantage, which, except for such waiver, the party otherwise would have enjoyed." *Pfeffer v. Arrendale*, 114 Ga.App. 684, 152 S.E.2d 651 (1966). Waiver may be established by expressed statements or implied by acts and conduct from which an intention to waive may reasonably be inferred. Ordinarily, mere silence is not sufficient to establish a waiver unless there is an obligation to speak. See, 28 Am.Jur.2d, *Estoppel and Waiver*, § 154 et seq. (1966).
>
> Although a party "may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially quali-

---

**32.** 759 F.2d 1542 (11th Cir.1985).

**33.** 240 Ga. 359, 240 S.E.2d 858 (1977).

fy those stated. If he speaks at all, he must make a full and fair disclosure." *Altman v. McCollum*, 107 Cal.App.2d [Supp.] 847, 236 P.2d 914, 922 (1951); *Sullivan v. Helbing*, 66 Cal.App. 478, 226 P. 803, 805 (1924); *Brady v. Carman*, 179 Cal.App.2d 63, 3 Cal.Rptr. 612 (1960).

. . . .

Questions of the existence of waiver are usually questions to be settled by the trier of fact.

240 S.E.2d at 863.

In *Aaron Rents, Inc. v. Corr*,[34] the Georgia Court of Appeals stated:

As a general premise, waiver need not be supported by consideration, is unilateral in character, must be made with knowledge and intent, and can be established by a certain course of conduct.

"[O]nce the incidental right or contractual benefit has been waived or relinquished, it cannot be reclaimed." *New York Underwriters Ins. Co. v. Noles*, supra, [101 Ga.App. 922], p. 925, 115 S.E.2d [474] p. 476 cits.

211 S.E.2d at 160.

The Court is persuaded from the evidence presented that Georgia Power and Piedmont–Forrest are estopped from contending that Debtor's interest in the Building Lease and Land Lease was terminated prior to the filing of Debtor's bankruptcy case. The Court has reached this conclusion sitting as the trier of fact. Mr. Jones told Mr. Hearnsberger that they had a deal. Mr. Griffin sent Mr. Saxon a memorandum that set forth the general framework of the deal. Mr. Saxon made only a minor change in the memorandum. Mr. Griffin then sent the memorandum to the RTC. The Court is persuaded that, as to Debtor, Georgia Power, and Piedmont–Forrest, the parties had reached an agreement. The Court is persuaded that it was Mr. Griffin's usual course of dealing to write the letters extending the termination dates. Once a deal had been struck between Debtor, Georgia Power and Piedmont–Forrest, it would be unjust to allow Georgia Power

and Piedmont–Forrest to ignore that agreement. Debtor was entitled to rely on the agreement. Mr. Jones admits that he probably would have given Debtor another extension. The Court is persuaded that Debtor believed the default provisions had been superseded by the agreement and the conduct of the parties.

The Court is persuaded that the actions of Georgia Power and Piedmont–Forrest conveyed to Debtor that it need not be concerned about any further extensions of the termination dates because an agreement had been reached. The Court is persuaded that Debtor reasonably relied upon those actions to its detriment.

Georgia Power and Piedmont–Forrest rely upon *Tybrisa Co. v. Tybeeland, Inc.*[35] In that case, a land owner made substantial alterations to his property in violation of the terms in the security deed. The lender saw the changes being made but said nothing. The lender later claimed a default based upon the breached covenant. The land owner argued that the lender was estopped because the lender had failed to object as the improvements were being made. The Georgia Supreme Court denied the estoppel argument and stated:

Here the [land owner] will not be heard to deny that he covenanted in his deed not to make any material alterations without the written consent of the [lender], hence he could not have in good faith believed that he could make such substantial alterations without first having obtained such written consent and if he did he became subject to the terms of the deed which were maturity of the debt and sale under the power. Nor did the [lender] have a duty to inform him of what he already knew. In order for an estoppel to arise, there must generally be some intended deception, or gross negligence amounting to constructive fraud by which another is misled to his injury. The [land owner] could not have been deceived as to the content of the deed he executed, which required him to obtain the written consent, nor was the [lender]

**34.** 133 Ga.App. 296, 211 S.E.2d 156 (1974).

**35.** 220 Ga. 442, 139 S.E.2d 302 (1964).

negligent in not telling him what he already knew. It was essential to estoppel here that the party claiming it, because of alleged conduct, was not only without knowledge of the requirement of written permission to make the alterations but also without convenient and available means of acquiring such knowledge.

139 S.E.2d at 305–06.

The facts in the case at bar are distinguishable from the facts in *Tybrisa Co.* Debtor reached an agreement with Georgia Power and Piedmont–Forrest. The Court is persuaded that this agreement superseded the default provisions of the leases.

 Debtor contends that it was a partner or joint venturer with Georgia Power and Piedmont–Forrest. Debtor contends that Georgia Power and Piedmont–Forrest breached certain partnership duties that caused damage to Debtor. Debtor contends that Georgia Power and Piedmont–Forrest could not unilaterally terminate its interest in the station because of the partnership. Debtor contends Georgia Power and Piedmont–Forrest owed "a fiduciary duty of the finest loyalty." *See* O.C.G.A. § 23–2–58 (1982).

In *Arford v. Blalock*,[36] the Georgia Court of Appeals stated:

> Any partnership agreement includes, as a matter of law, an agreement for each partner to act in "the utmost good faith" towards the other partner. The power of a partner to dissolve the partnership at will, "like any other power held by a fiduciary, must be exercised in good faith.... A partner may not ... 'freeze out' a co-partner and appropriate the business to his own use. A partner may not dissolve a partnership to gain the benefits of the business for himself, unless he fully compensates his co-partner for his share of the prospective business opportunity....["]

405 S.E.2d at 702.

In *Harris v. Escoe (In re Woolston)*,[37] this Court stated:

---

36. 199 Ga.App. 434, 405 S.E.2d 698 (1991), *aff'd,* 262 Ga. 95, 414 S.E.2d 1 (1992).

37. 147 B.R. 279 (Bankr.M.D.Ga.1992).

In 1984, the Georgia Legislature adopted a version of the Uniform Partnership Act. The new statute completely superseded the prior partnership statute and became effective April 1, 1985. Larry E. Ribstein, *An Analysis of Georgia's New Partnership Law,* 36 Mercer L.Rev. 443, 443–44 and 448 (1985). Georgia cases decided prior to April 1, 1985, must be considered with caution.

147 B.R. at 282.

 "In Georgia, the issue of partnership 'is generally a mixed question of law and fact, and cannot be resolved as a matter of law *unless the verdict one way or the other is demanded by the evidence.*'" *Flatau v. Tribble's Shoes, Inc. (In re Lawrence),* 82 B.R. 157, 161 (Bankr.M.D.Ga. 1988) (emphasis in original).

"A partnership is an association of two or more persons to carry on as co-owners a business for profit." O.C.G.A. § 14–8–6(a) (1989).

Section 14–8–7 of the Official Code of Georgia Annotated [38] provides:

**14–8–7. Determination of existence of partnership.**

In determining whether a partnership exists, the following rules shall apply:

(1) Except as provided by Code Section 14–8–16 persons who are not partners as to each other are not partners as to third persons;

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property;

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived;

(4) The receipt by a person of a share of the profits of a business is

---

38. O.C.G.A. § 14–8–7 (1989).

prima facie evidence that he is a partner in the business; provided, however, that no such inference shall be drawn if profits were received in payment of the following, even though the amount of payment varies with the profits of the business:

(A) A debt, whether by installments or otherwise;

(B) Wages, salary, or other compensation to an employee or independent contractor;

(C) Rent to a landlord;

(D) An annuity or other payment to a surviving spouse or representative of a deceased partner;

(E) Interest or other payment or charge on a loan;

(F) Consideration for the sale of good will of a business or other property, whether by installments or otherwise.

O.C.G.A. § 14–8–7 (1989).

■ "The law of this State as pronounced by the decisions of both our appellate courts is that the general laws governing partnerships and agency of partners is applicable to joint adventurers." *Fulton National Bank of Atlanta v. Didschuneit*, 92 Ga.App. 527, 88 S.E.2d 853, 857 (1955).

■ "Broadly, there is a joint [venture] when two or more combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control, provided the arrangement does not establish a partnership." *Davenport v. Oglethorpe Power Corp.*, 196 Ga.App. 632, 396 S.E.2d 580, 581 (1990), *cert. denied.*

■ A joint enterprise or venture may be found to exist even though a profit motive and mutual control are otherwise lacking. *City of Eatonton v. Few*, 189 Ga.App. 687, 377 S.E.2d 504, 506 (1988); *cert. denied* (1989).

■ "[Parties] are not joint venturers simply because their businesses are interdependent." *Davenport v. Oglethorpe Power Co.*, 396 S.E.2d at 582.

■ "Absent agreement, though, persons do not become venturers as between themselves simply by virtue of the pursuit of joint interests in a common excursion." *Putnam v. Williams*, 652 F.2d 497, 500 (5th Cir.1981) (citing *Keaton v. Fenton*, 147 Ga.App. 579, 579–80, 249 S.E.2d 629 (1978)).

The Investment Memorandum sent to prospective limited partners stated Debtor and Georgia Power would not: (1) hold themselves out to others as co-venturers, (2) share in managing the property, (3) share in the net profits derived from the property, or (4) file annual federal income tax returns as joint venturers. Mr. Campbell did not believe that Debtor was a joint venturer with Georgia Power or Piedmont–Forrest when the transaction was entered into in June of 1984.

The Court is persuaded that Debtor and Georgia Power were not partners or joint venturers when they entered into the transaction in June of 1984.

Debtor contends that a partnership later resulted because Georgia Power took an active role in developing the station and because Piedmont–Forrest would receive profits from the development. Georgia Power's representatives arranged for civic groups to use the station, attended meetings with community leaders, showed the station to prospective tenants, and supervised maintenance at the station. Georgia Power had to perform the duties because Debtor did not have a representative at the station during most of the relevant time. The active role played by Georgia Power was a result, in part, of Debtor's failure to have a representative at the station. Georgia Power wanted the station to prosper. It wanted to enhance its community image and would receive "percentage rent" if another tenant moved into the station. If Debtor purchased the land and the station in the thirtieth year, the value would depend, in part, on the amount of rent paid by tenants. The Court is not persuaded, however, that Debtor and Georgia Power were co-owners of a business for profit. The Court is not persuaded that the parties intended to be partners. Debtor did not file partnership tax returns with Georgia Power and Piedmont–Forrest. The Court is not persuaded that Debtor became a

partner or joint venturer with Georgia Power or Piedmont–Forrest.

Debtor contends it is entitled to damages for Georgia Power's tortious and malicious interference with its business relations. Debtor relies on *Tedford v. Roswell Village, Ltd.*,[39] in which the Georgia Court of Appeals stated:

" 'Where one maliciously and wrongfully, and with the intent to injure another person's business prevents others from dealing with him and his business is thereby injured, the person thus injured has a cause of action against the person thus causing the injury, for the loss and damage sustained.' [Cits.]" *NAACP v. Overstreet*, 221 Ga. 16, 21, 142 S.E.2d 816 (1965). In an action for interference with contract, " 'malicious' or 'maliciously' means any unauthorized interference, or any interference without legal justification or excuse." *Luke v. DuPree*, 158 Ga. 590, 596, 124 S.E. 13 (1924).

328 S.E.2d at 405.

Debtor also relies upon Georgia Code section 51–9–1,[40] which provides:

**51–9–1. Cause of action for interference with enjoyment of property.**

The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.

O.C.G.A. § 51–9–1 (1982).

In *Wise v. State Board for Examination, Qualification & Registration of Architects*,[41] the Georgia Supreme Court stated:

"This state recognizes a cause of action where one maliciously and wrongfully, and with intent to injure, harms the business of another. *Dale v. City Plumbing etc., Co.*, 112 Ga.App. 723(2), 146 S.E.2d 349 (1965). 'The act is malicious when the thing done is with the knowledge of the plaintiff's rights, and with the intent

to interfere therewith.' *Employing Printers Club v. Doctor Blosser Co.*, 122 Ga. 509, 519, 50 S.E. 353 (1905). 'The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.' Restatement, Second, Torts § 766, p. 11, h." *Bodge v. Salesworld, Inc.*, 154 Ga.App. 65, 66, 267 S.E.2d 505 (1980).

274 S.E.2d at 548.

In *DeLong Equipment Co. v. Washington Mills Abrasive Co.*,[42] the Eleventh Circuit Court of Appeals stated:

A claim based on tortious interference with business relations does not require evidence of a binding contract. *Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.*, 174 Ga.App. 197, 329 S.E.2d 554, 557–58 (1985). Interference with the plaintiff's relationships with its customers, suppliers, or representatives may be actionable even though such relationships may be terminable at will. *U.S. Anchor Manufacturing, Inc. v. Rule Industries, Inc.*, 717 F.Supp. 1565, 1577 (N.D.Ga.1989), *citing E.D. Lacey Mills, Inc. v. Keith*, 183 Ga. App. 357, 359 S.E.2d 148, 155 (1987).

The party charged with tortious interference must have "(1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury." *Id.*, *quoting Hayes v. Irwin*, 541 F.Supp. 397, 429 (N.D.Ga.1982), *aff'd mem.*, 729 F.2d 1466 (11th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). Interference with business relationships will be excused if it is privileged. *Orkin Exterminating*

---

**39.** 173 Ga.App. 780, 328 S.E.2d 403 (1985).

**40.** O.C.G.A. § 51–9–1 (1982).

**41.** 247 Ga. 206, 274 S.E.2d 544 (1981), *appeal dismissed*, 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981).

**42.** 887 F.2d 1499 (11th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

*Co. v. Martin Co.*, 240 Ga. 662, 242 S.E.2d 135 (1978). "[I]n order for [the defendant] to come under the protection of the competition privilege, it must establish inter alia that it did not employ improper means." *Integrated Micro Systems*, 174 Ga.App. at 202, 329 S.E.2d at 559. The privilege defense is not available where interference is achieved through actions taken in violation of a confidential relationship. *Hayes*, 541 F.Supp. at 430; *E.D. Lacey Mills*, 183 Ga.App. at 364, 359 S.E.2d at 156. 887 F.2d at 1518–19.

■ Debtor has the burden of proving all four prongs of the test for tortious interference of business relations. *Union Carbide Corp. v. Tarancon Corp.*, 682 F.Supp. 535, 543 (N.D.Ga.1988).

■ Atlanta Gas Light wanted to lease space in the monument area of the station. Georgia Power did not want Atlanta Gas Light to be a co-tenant because they were competitors. Debtor did not need Georgia Power's approval to lease the space to Atlanta Gas Light. Debtor did not pursue Atlanta Gas Light because it wanted to keep Georgia Power happy. The Court is not persuaded that this was tortious interference under Georgia law.

Debtor initially pursued the retail store concept started by Georgia Power. Mr. Baisden asked Mr. Ogle to drop this concept in January of 1986. The station would be in direct competition with downtown stores and the Galleria. Georgia Power saw this as undesirable. The Building Lease and Land Lease were executed on June 28, 1984. Debtor failed to find a single retail store tenant during the eighteen months that passed between execution of the leases and Mr. Baisden's statement to Mr. Ogle. Debtor did not even actively pursue local retail shops. The Court is not persuaded that this was tortious interference.

A number of civic groups were allowed to use the station for public events and meetings. The civic groups would contact Mr. Baisden, who arranged for the groups to use the station. Mr. Baisden did not always tell Debtor that a group was going to use the station. Debtor did not have an employee at the station. Mr. Baisden was the only person the groups could contact. The Court is not persuaded that this was tortious interference.

Georgia Power's space in the mezzanine area looked down on the monument area. Construction of Georgia Power's space had begun before the Building Lease, the Land Lease, and the Development Agreement were signed in June of 1984. Debtor went ahead with the mezzanine plan to keep Georgia Power happy. The Court is not persuaded that Georgia Power's desire to develop and occupy the mezzanine area was tortious interference.

Debtor contends that Georgia Power and Piedmont–Forrest interfered with the Chamber of Commerce becoming a tenant. Debtor and Georgia Power worked together in trying to lease space in the station to the Chamber of Commerce. The Chamber had its own building and was concerned that it would lose its autonomy if it moved to the station. The Chamber's move would have been part of the conference center concept. The Macon City Council voted against participating in this concept in August of 1989. The Court is not persuaded that the actions of Georgia Power and Piedmont–Forrest prevented the Chamber from moving to the station. The Court is not persuaded that Georgia Power or Piedmont–Forrest interfered with Debtor's business relations.

Ms. Marshall, executive director of the Convention Bureau, sent Mr. Hearnsberger a letter dated November 7, 1989, stating that the Convention Bureau wanted to move to the station as soon as possible. The lease terms proposed by Debtor were acceptable to the Convention Bureau. On April 10, 1990, Mr. Turk sent copies of a proposed lease with the Convention Bureau for Mr. Hearnsberger to sign. Mr. Hearnsberger, on behalf of Debtor, signed the lease and mailed it to Mr. Turk on April 16, 1990. The Convention Bureau did not sign the lease. Debtor has not shown when, or even if, Mr. Turk received the lease signed by Mr. Hearnsberger. Debtor has not shown the circumstances that prevented

Ms. Marshall from signing the lease with Debtor. After the Building Lease and Land Lease were purportedly terminated, the Convention Bureau executed an almost identical lease with Piedmont–Forrest. The Court has determined that Debtor's interest in the station was not terminated. Debtor is thus entitled to recover from Piedmont–Forrest all sums paid to Piedmont–Forrest by the Convention Bureau under the terms of its lease.

■ Georgia Power's representative talked with the RTC about how to deal with Debtor's interest in the station. The RTC initiated the contacts. Mr. Baisden met with the RTC without the knowledge or approval of Debtor. Mr. Baisden admitted that it would be improper for him to talk with the RTC about "getting the partnership out." It is clear that Debtor did not develop or operate the station as anticipated. Debtor failed to make its rent payments almost every month beginning in July of 1989. Southern Floridabanc and the RTC cured a number of defaults. The Building Lease, the Land Lease, and Debtor's obligation to the RTC provided certain remedies if Debtor failed to make its rent payments. The Court is not persuaded that the action of Georgia Power or Piedmont–Forrest was malicious and wrongful as required by Georgia law.

Debtor contends it is entitled to certain funds from the condemnation of the option parcel. On September 21, 1990, Piedmont–Forrest gave notice, through this adversary proceeding, of its intent to sever part of the separate parcel from the Land Lease. The option parcel is part of the separate parcel. The City filed a condemnation proceeding on December 6, 1990, naming a number of defendants. The defendants include Debtor and Urban Properties. Debtor appeared, through counsel, and asserted that it owned rights in the option parcel. The Superior Court of Bibb County, Georgia, accepted the special master's determination that Debtor was not entitled to any award or damages. That determination is final and binding as between Debtor and the City.

■ Georgia Power and Piedmont–Forrest contend the state court determination is res judicata in this adversary proceeding. Georgia Power and Piedmont–Forrest rely upon *Hart v. Yamaha–Parts Distributors, Inc.,*[43] in which the Eleventh Circuit Court of Appeals stated:

Res judicata is a doctrine of claim preclusion; it refers to "the preclusive effect of a judgment in foreclosing relitigation of matters that should have been raised in an earlier suit." *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). Although both actions were based on state law and originally brought in state court, we apply federal common law because we are determining the preclusive effect of a federal judgment. *See, e.g., Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499, 1503 (11th Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 966, 83 L.Ed.2d 970 (1985). For res judicata to bar appellant's second action, four elements must be present: (1) a final judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits, and (4) the same cause of action must be involved in both cases. *Ray v. Tennessee Valley Authority,* 677 F.2d 818, 821 (11th Cir.1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983) (quoting *Stevenson v. International Paper Co.,* 516 F.2d 103, 108 (5th Cir.1975).

787 F.2d at 1470.

Georgia Power and Piedmont–Forrest have failed to show that the third element has been satisfied. They were not parties to the condemnation proceeding. Since the parties in these consolidated adversary proceedings are not identical to the parties in the condemnation proceeding, res judicata does not apply. The Court also notes that in the superior court action, the City was condemning a parcel of real property and not adjudicating a cause of action between

**43.** 787 F.2d 1468 (11th Cir.1986).

Debtor, Georgia Power, and Piedmont–Forrest.

On September 21, 1990, Georgia Power and Piedmont–Forrest executed quitclaim deeds, conveying their interest in the option parcel to the City. Piedmont–Forrest has exercised its right under the Land Lease to reacquire part of the separate parcel. Debtor is entitled to the remedies as provided in the Land Lease.

Debtor contends Georgia Power and Piedmont–Forrest committed fraud by misleading Debtor into believing no lease termination deadline was pending or would be imposed. Debtor contends "If this termination is upheld, [Piedmont–Forrest] is liable to [Debtor] ... as a result of a fraud perpetrated on [Debtor]." The Court has determined that Debtor's interest was not terminated and need not address this contention.

Debtor also asserts "a claim for punitive damages as a result of the breach of fiduciary duty or fraud" of Georgia Power and Piedmont–Forrest. The Court has determined that no partnership or joint venture existed. Thus, there has been no breach of a fiduciary duty. The Court has determined that Georgia Power and Piedmont–Forrest did not perpetrate a fraud. The Court, therefore, need not address this claim for punitive damages.

■■■ Finally, Debtor contends that the claims of Georgia Power and Piedmont–Forrest should be subordinated under section 510(c) of the Bankruptcy Code.[44] This section provides:

**§ 510. Subordination**

. . . .

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C.A. § 510(c) (West 1993).

In *Allied Eastern States Maintenance Corp. v. Miller (In re Lemco Gypsum, Inc.),*[45] the Eleventh Circuit Court of Appeals stated:

Title 11 U.S.C.A. § 510(c) adopts the long-standing judicially developed doctrine of equitable subordination under which a bankruptcy court has power to subordinate claims against the debtor's estate to claims it finds ethically superior under the circumstances. *In re N & D Properties,* 799 F.2d 726, 731 (11th Cir. 1986); *see also Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); 9A Am.Jur.2d *Bankruptcy* §§ 745–49 (1980). Proper exercise of the equitable subordination power can take place only where three elements are established:

(1) The claimant must have engaged in some type of inequitable conduct,

(2) The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant,

(3) Subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel,* 563 F.2d 692, 700 (5th Cir.1977) (citations omitted); *accord N & D Properties,* 799 F.2d at 731; *In re Multiponics,* 622 F.2d 709, 713 (5th Cir. 1980). The inequitable conduct need not be related to the acquisition or assertion of the claim. *Mobile Steel,* 563 F.2d at 700. The claim can be subordinated only to the extent necessary to offset the harm suffered by the bankrupt and its creditors on account of that conduct. *Id.* at 701.

911 F.2d at 1556.

Debtor contends that Georgia Power's "exclusionary control of the development operations and secret dealings" show inequitable conduct. The Court is not persuaded that Debtor has shown the inequitable conduct needed for the Court to order sub-

**44.** 11 U.S.C.A. § 510(c) (West 1993).

**45.** 911 F.2d 1553 (11th Cir.1990).

ordination of Georgia Power's or Piedmont–Forrest's claims. Since the Court is persuaded that Debtor's interest was not terminated, the Court is unable to find harm to Debtor's bankruptcy estate or to Debtor's creditors.

Debtor moves the Court for authority, under section 365(a) of the Bankruptcy Code,[46] to assume its sublease with Georgia Power. Georgia Power objects to the assumption. The Court has determined that Debtor's interest in the Building Lease and Land Lease was not terminated and that Debtor is the owner of the station and its adjacent land, subject to the security interest of Piedmont–Forrest.

Since the Court has determined that Georgia Power and Piedmont–Forrest improperly terminated the rights of Debtor, the Court is persuaded that Debtor should be allowed to assume its sublease with Georgia Power. Any claim that Georgia Power has against Debtor under the terms of the sublease, whether prepetition or postpetition, may be asserted by Georgia Power through the filing of a proof of claim.

Debtor also moves the Court for authority to assume subleases with United Way and the Convention Bureau. The term of the sublease with United Way has expired and United Way is a tenant at will. The Convention Bureau signed a lease with Piedmont–Forrest, not with Debtor. Thus, there are no subleases for Debtor to assume with United Way and the Convention Bureau.

An order in accordance with this memorandum opinion will be entered this date.

SO ORDERED.

---

**46.** 11 U.S.C.A. § 365(a) (West 1993). This section provides:

§ 365. **Executory contracts and unexpired leases**

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C.A. § 365(a) (West 1993).

EXHIBIT A

## ORDER

In accordance with the memorandum opinion entered this date; it is

ORDERED that the termination by Georgia Power Company and Piedmont–Forrest Corporation of the rights of Historic Macon Station Limited Partnership, Debtor, in the following described leases:

1. Building Lease between Piedmont–Forrest Corporation, successor in interest to Georgia Power Company, as Landlord, and Historic Macon Station Limited Partnership, as Tenant, dated as of June 28, 1984; and

2. Land Lease between Piedmont–Forrest Corporation, successor in interest to Georgia Power Company, as Landlord, and Historic Macon Station Limited Partnership, as Tenant, dated as of June 28, 1984;

hereby is determined to be of no legal effect; and it is further

ORDERED that Debtor is determined to be the legal owner of the Macon Terminal Station and its adjacent land, subject to the security interest of Piedmont–Forrest Corporation, assignee of the security interest once held by Georgia Power Company; and it is further

ORDERED that Debtor is entitled to recover from Georgia Power Company and Piedmont–Forrest Corporation all sums to which Debtor would have been entitled under the two above-described leases as if there had been no termination; and it is further

ORDERED that, since the Court, from the evidence presented, is unable to determine the sums due Debtor, the parties are directed to confer within thirty days of this order to arrive at the sums due Debtor, and if the parties are unable to reach an agreement, then the Court will schedule a hearing. Counsel for Debtor is to report to the Court on this issue within forty-five days of this order; and it is further

ORDERED that Georgia Power Company and Piedmont–Forrest Corporation may file proofs of claim in Debtor's Chapter 11 bankruptcy case for any sums that Debtor may owe them under the terms of the above-described leases; and it is further

ORDERED that Piedmont–Forrest Corporation validly exercised its right under the Land Lease to reacquire a portion of the Separate Parcel and that, accordingly, Debtor is entitled to the remedies provided in the Land Lease on account of said reacquisition; and it is further

ORDERED that Debtor is authorized to assume its sublease with Georgia Power Company, said sublease being described as follows:

Lease between Historic Macon Station Limited Partnership, as Landlord, and Georgia Power Company, as Tenant, dated as of June 28, 1984;

and it is further

ORDERED that all other relief sought by Debtor hereby is denied.

SO ORDERED.